NO. 24-3094

# In the
# United States Court of Appeals
# for the Eighth Circuit

Minnesota Voters Alliance; Mary Amlaw;
Ken Wendling; Tim Kirk

*Plaintiffs-Appellants,*

v.

Keith Ellison, in his official capacity as
Attorney General; Brad Johnson, in his
Official capacity as Anoka County Attorney,

*Defendants-Appellees.*

On Appeal from the United States District Court
For the District of Minnesota
District Court No. 0:23-cv-02774-NEB

## APPELLEE ANOKA COUNTY ATTORNEY BRAD JOHNSON'S RESPONSE BRIEF

**KEITH ELLISON**
Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131

**BRAD JOHNSON**
Anoka County Attorney

**BY: JASON J. STOVER**
Assistant Anoka County Attorney
License No. 30573X
Anoka County Government Center
2100 Third Avenue, STE 720
Anoka, Minnesota 55303-5025

*Attorneys for Appellee Brad Johnson*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee Anoka County Attorney Brad Johnson requests that this Court schedule oral argument on this matter, 15 minutes per side.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT .............................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE .............................................................3

SUMMARY OF THE ARGUMENT ....................................................8

ARGUMENT ......................................................................................10

    I. The Amended Complaint Presents Only an As-Applied
       Challenge ...................................................................................14

    II. The District Court Correctly Found that MVA's Speech
        May Not Implicate Section 211B.075 .......................................18

          A. The Amended Complaint denies that MVA violated the
             statute ...................................................................................18

          B. MVA cannot rely on the counterclaim .........................22

    III. MVA's Proposed Speech is Not Entitled to Any First
         Amendment Protection .............................................................24

          A. Fraud ....................................................................................27

          B. False statements leading to harm ..................................30

          C. True threats .......................................................................35

IV.   If the First Amendment Applies, Then Section 211B.075 Must Be Evaluated Under Intermediate Scrutiny ............... 36

    A. The Supreme Court's *Alvarez* opinion ........................... 36

    B. The *Mackey* and *Wohl* decisions ...................................... 39

    C. Section 211B.075 does not regulate political speech .. 43

V. Section 211B.075 is Constitutional Under Intermediate Scrutiny ....................................................................................... 48

VI.   Section 211B.075 Also Passes Strict Scrutiny ................. 55

VII.   Subdivision 5 Is Not a Prior Restraint ............................. 61

CONCLUSION ........................................................................................ 66

CERTIFICATE OF COMPLIANCE ..................................................... 67

CERTIFICATE OF SERVICE .............................................................. 68

# TABLE OF AUTHORITIES

**Page**

## CASES

*281 Care Committee v. Arneson,*
766 F.3d 774 (8th Cir. 2014) ...................................... passim

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) .................................................... 55

*Aitken v. Commc'ns Workers of Am.,*
496 F. Supp. 2d 653 (E.D. Va. 2007).......................... 28

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) .................................................... 44

*Animal Legal Defense Fund v. Reynolds,*
89 F.4th 1065 (8th Cir. 2024)........................ 16, 31, 32, 33

*Animal Legal Defense Fund v. Reynolds,*
8 F.4th 781 (8th Cir. 2021)......................................... 31

*Associated Builders and Contractors v. Ventura,*
610 N.W.2d 293 (Minn. 2000) ...................................... 3

*Backpage.com, LLC v. Dart,*
807 F. 3d 229 (7th Cir. 2015) ................................. 63, 64

*Bishop v. Bartlett,*
575 F.3d 419 (4th Cir. 2009) ...................................... 34

*Brown v. Hartlage,*
456 U.S. 45 (1982) ................................................. 45, 48

*Burdick v. Takushi,*
504 U.S. 428 (1992) .................................................... 44

*Burson v. Freeman,*
504 U.S. 191 (1992) ................................................. 2, 56

*Clark v. Schmidt,*
493 F. Supp. 3d 1018 (D. Kan. 2020)........................... 60

*Clobes v. 3M Co.,*
106 F.4th 803 (8th Cir. 2024)..................................... 20

*Craig v. Simon,*
493 F. Supp. 3d 773 (D. Minn.)................................... 34

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
489 U.S. 214 (1989) .................................................... 45

*FEC v. Akins,*
    524 U.S. 11 (1998) ........................................................................ 34

*First Nat'l Bank v. Bellotti,*
    435 U.S. 765 (1978) ........................................................................ 49

*Frank v. Lee,*
    84 F.4th 1119 (10th Cir. 2023) ................................................. 56, 59

*Havlak v. Vill. of Twin Oaks,*
    864 F.3d 905 (8th Cir. 2017) ..................................................... 15, 16

*Hershey v. Jasinski,*
    86 F.4th 1224 (8th Cir. 2023) ........................................................ 62

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.,*
    538 U.S. 600 (2003) ........................................................ 27, 29, 30

*Jensen v. Minn. Board of Medical Practice,*
    2024 WL 1345174 (D. Minn. 2024) ............................................... 21

*Marks v. United States,*
    430 U.S. 188 (1977) ........................................................................ 37

*McCullen v. Coakley,*
    573 U.S. 464 ................................................................................... 21

*Miller v. City of Excelsior,*
    618 F. Supp. 3d 820 (D. Minn. 2022) ........................................... 21

*Minnesota Voters Alliance v. Hunt,*
    10 N.W.3d 163 (Minn. 2024) ........................................................... 3

*Minnesota Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) ................................................................ 1, 12, 49

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ....................................................................... 17

*Munro v. Socialist Workers Party,*
    479 U.S. 189 (1986) ....................................................................... 59

*National Coalition on Black Civic Participation v. Wohl,*
    661 F. Supp. 3d 78 (S.D. N.Y. 2023) .............................. 2, 35, 42, 56

*OPAWL v. Yost,*
    118 F. 4th 770 (6th Cir. 2024) ................................................. 59, 60

*Piekarski v. Home Owners Sav. Bank, F.S.B.,*
    956 F.2d 1484 (8th Cir. 1992) ....................................................... 28

*Republican Party of Minn. v. Klobuchar,*
    381 F.3d 785 (8th Cir. 2004) ......................................................... 21

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,*
    487 U.S. 781 (1988) ....................................................................... 27

*Schneider v. State of New Jersey, Town of Irvington,*
   308 U.S. 147 (1939) ...................................................................... 29
*Storer v. Brown,*
   415 U.S. 724 (1974) ...................................................................... 44
*Styczinski v. Arnold,*
   727 F.Supp.3d 821 (D. Minn. 2024) ...................................... 64, 65
*TikTok Inc. v. Garland,*
   122 F.4th 930 (D.C. Cir. 2024) ................................................... 57
*Turner Broadcasting System, Inc. v. F.C.C.,*
   520 U.S. 180 (1997) ...................................................................... 49
*U.S. Bank N.A. v. Cold Spring Granite Co.,*
   802 N.W.2d 363 (Minn. 2011) ..................................................... 28
*U.S. v. Williams,*
   690 F.3d 1056 (8th Cir. 2012) ..................................................... 30
*United States v. Alvarez,*
   567 U.S. 709 (2012) ............................................................. passim
*United States v. Dierks,*
   978 F.3d 585 (8th Cir. 2020) ...................................................... 35
*United States v. Hansen,*
   599 U.S. 762 (2023) ...................................................................... 17
*United States v. Mackey,*
   652 F. Supp. 3d 309 (E.D.N.Y. 2023) ................................. passim
*United States v. Salerno,*
   481 U.S. 739 (1987) ...................................................................... 17
*United States v. Stevens,*
   559 U.S. 460 (2010) ............................................................... 26, 27
*Viewpoint Neutrality Now! v. Board of Regents,*
   109 F.4th 1033 (8th Cir. 2024) ................................................... 62
*Vill. of Schaumburg v. Citizens for a Better Env't,*
   444 U.S. 620 (1980) ...................................................................... 27
*Virginia v. Black,*
   538 U.S. 343 (2003) ...................................................................... 35
*Wesberry v. Sanders,*
   376 U.S. 1 (1964) .......................................................................... 44
*Williams-Yulee v. Florida Bar,*
   575 U.S. 433 (2015) ............................................................... 55, 57
*Xiong v. Lynch,*
   836 F.3d 948 (8th Cir. 2016) ...................................................... 24

vi

*Young Am.'s Found. v. Kaler*,
    14 F.4th 879 (8th Cir. 2021) .................................................. 21

**STATUTES**

18 U.S.C. § 704 ..................................................................... 25
Minn. Stat. § 201.014 ......................................................... 3,36
Minn. Stat. § 204C.035 ............................................................ 54
Minn. Stat. § 211B.075 ..................................................... passim

**OTHER AUTHORITIES**

*A Constitutional Right to Lie in Campaigns and Elections?*,
    74 Mont. L. Rev. 53 (2013) ................................................. 45
*Legislating Against Lying in Campaigns and Elections*,
    71 Okla. L. Rev. 141 (2018) ................................................ 46

# STATEMENT OF ISSUES

1.    Whether a state may constitutionally regulate its own elections process by restricting false speech about who is allowed to vote.

Apposite Cases:

      a.     *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018)

      b.     *United States v. Alvarez*, 567 U.S. 709 (2012)

      c.     *United States v. Mackey*, 652 F. Supp. 3d 309 (E.D.N.Y. 2023)

2.    Whether false speech about who may participate in the electoral process falls outside the protections of the First Amendment.

Apposite Cases:

      a.     *United States v. Alvarez*, 567 U.S. 709 (2012)

      b.     *United States v. Mackey*, 652 F. Supp. 3d 309 (E.D.N.Y. 2023)

3.    If false speech about who may participate in the electoral process is entitled to any First Amendment protection at all, whether a law restricting that speech is subject to intermediate or strict scrutiny.

Apposite Cases:

      a.     *United States v. Alvarez*, 567 U.S. 709 (2012)

      b.     *United States v. Mackey*, 652 F. Supp. 3d 309 (E.D.N.Y. 2023)

4.      Whether Minn. Stat. § 211B.075 survives intermediate and/or strict scrutiny.

<u>Apposite Cases:</u>

      a.      *United States v. Alvarez*, 567 U.S. 709 (2012)

      b.      *United States v. Mackey*, 652 F. Supp. 3d 309 (E.D.N.Y. 2023)

      c.      *National Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D. N.Y. 2023)

      d.      *Burson v. Freeman*, 504 U.S. 191 (1992)

## STATEMENT OF THE CASE

In 2023, the Minnesota legislature restored convicted felons' right to vote by amending Minn. Stat. § 201.014. The Minnesota Voters Alliance ("MVA")[1] challenged the new law because it supposedly conflicts with Minnesota's Constitution. The district court dismissed MVA's lawsuit and the Minnesota Supreme Court affirmed. *Minnesota Voters Alliance v. Hunt*, 10 N.W.3d 163 (Minn. 2024). Laws passed by the Minnesota legislature are presumed constitutional until a court holds otherwise. *Associated Builders and Contractors v. Ventura*, 610 N.W.2d 293, 299 (Minn. 2000). Because MVA's challenge to Section 201.014 failed, current Minnesota law allows convicted felons to vote when not incarcerated.

The Minnesota legislature passed another new law, Minn. Stat. § 211B.075. As the District Court found below, the heart of MVA's lawsuit is Subdivision 2 of that statute, which provides:

> Subd. 2. **Deceptive practices**. (a) No person may, within 60 days of an election, cause information to be transmitted by any means that the person:

---

[1] Appellants Minnesota Voters Alliance, Mary Amlaw, Ken Wendling, and Tim Kirk will collectively be referred to as "MVA."

(1) intends to impede or prevent another person from exercising the right to vote; and

(2) knows to be materially false.

(b) The prohibition in this subdivision includes but is not limited to information regarding the time, place, or manner of holding an election; the qualifications for or restrictions on voter eligibility at an election; and threats to physical safety associated with casting a ballot.

MVA challenged that law by filing a lawsuit against Attorney General Keith Ellison and Anoka County Attorney Brad Johnson. MVA filed its Amended Complaint on October 17, 2023. (App. 1; R. Doc. 13). Through that document, MVA alleged that it intended to express its view that "felons who have not served their full sentences, or otherwise had their sentences discharged, cannot legally vote." (App. 2; R. Doc. 13; AC ¶5). MVA denied, however, that it believed its statement to be false or that it intended that statement to impede any person from voting. (App. 18-19; R. Doc. 13; AC ¶¶59, 61, 63, 65, 70). Based on MVA's expressed intent to continue making false statements about voter eligibility for felons,

County Attorney Johnson filed a counterclaim to determine whether MVA had violated Section 211B.075.[2]  (App. 55-67; R. Doc. 16).

Attorney General Ellison moved to dismiss MVA's Amended Complaint and County Attorney Johnson moved for judgment on the pleadings.  MVA moved for a preliminary injunction against both defendants.  No party sought any relief with respect to County Attorney Johnson's counterclaim.  MVA did not move to dismiss the counterclaim or seek judgment on the pleadings with respect to it.  County Attorney Johnson did not move for summary judgment.  To the contrary, County Attorney Johnson advised MVA that he did not intend to take any further action until the District Court first ruled on the parties' respective motions.  (App. 246; R. Doc. 43-1).

The District Court granted Attorney General Ellison's Motion to Dismiss and County Attorney Johnson's Motion for Judgment on the Pleadings and denied MVA's Motion for Preliminary Injunction.  The District Court concluded that MVA's statement that felons do not have a right to vote is at least "partially false," explaining that:

---

[2] The citations in this brief to Johnson's counterclaim refer to the amended counterclaim.

> MVA intends to tell prospective voters in this cycle that "[f]elons still serving their sentences do not have a right to vote in Minnesota" and "felons who have not served their full sentences, or otherwise had their sentences discharged, cannot legally vote." (Am. Compl. ¶¶ 1, 5.) Under the Re-Enfranchisement Act, these statements are at least partially false, because a person serving a sentence but not incarcerated is able to vote under that statute.

(App. 332; R. Doc. 53; Order, p. 3). The District Court further held, however, that MVA's proposed statement "is not necessarily proscribed by Subsection 2 of the Election Law" for two reasons. (App. 336; R. Doc. 53; Order, p. 7). First, the statute extends only to statements that the speaker knows to be "materially false." Because MVA alleged that it had a "good-faith belief" that its statements were true, those statements on their face were not necessarily proscribed by the statute. (*Id.*). Second, the statute proscribes only speech that the speaker "intends to impede or prevent another person from exercising the right to vote." The District Court found that "MVA alleges no facts alleging that it has such an intent, so its speech is not proscribed by the Election Law for that reason as well." (App. 337; R. Doc. 53; Order, p. 8).

Even if Section 211B.075 prohibited MVA's alleged speech, however, the District Court found that the statute "does not regulate

political speech." (App. 338-339; R. Doc. 53; Order, pp. 8-9). While regulation of false *political* speech might be subject to strict scrutiny, regulation of false speech about other topics is treated differently. (*Id.*). While the District Court found that it was not clear whether Section 211B.075 should be subject to strict scrutiny at all, it nevertheless found that the statute would survive that level of scrutiny because it is narrowly tailored to advance the state's compelling interest in protecting "the integrity and reliability of the electoral process." (App. 338-340; R. Doc. 53; Order, pp. 9-11). The District Court granted Appellees' motions, and this appeal followed.

MVA's Amended Complaint presents only an as-applied challenge to Section 211B.075.  While MVA styles its challenge as a facial one, MVA has never explained how any third party might be affected differently than MVA itself, nor has MVA analyzed the relationship between the statute's allegedly unconstitutional application and any speech that it permissibly does regulate.  In evaluating MVA's challenge, the District Court correctly focused solely on the speech contained in MVA's Amended Complaint.

Taking MVA's allegations as true, the District Court properly found that MVA's alleged speech does not necessarily violate the statute.  Section 211B.075 applies only to speech that is "materially false" and which the person "intends to impede or prevent another person from exercising the right to vote."  It also extends only to speech made "within 60 days of an election."  MVA alleges in its Amended Complaint that it believes its speech to be true and does not intend its speech to interfere with anyone's ability to vote.  Accepting those allegations as true, as required when resolving a Rule 12 motion, the District Court correctly held that MVA's speech does not fall within the prohibitions imposed by

the statute. MVA has failed to raise a proper challenge to Section 211B.075 because it has not identified any way in which its speech is restricted.

That analysis is unaffected by County Attorney Johnson's counterclaim. MVA's Amended Complaint gave County Attorney Johnson a good-faith basis to allege a potential violation of the statute, but the mere act of filing a counterclaim does not establish that MVA has, in fact, violated the statute. No party asked the District Court to rule on County Attorney Johnson's counterclaim, so the merits of that claim have not yet been decided and are not presently before this Court.

Even if the speech alleged in MVA's Amended Complaint fell within the statute, however, that speech would not be entitled to First Amendment protection at all. The First Amendment does not extend protection to fraud, false statements leading to harm, or true threats. MVA's proposed false statement that felons are not allowed to vote in Minnesota qualifies as all three.

Should this Court disagree and find that MVA's speech is entitled to First Amendment protection, that protection is limited because MVA's speech is not political in nature. The Supreme Court in *United States v.*

*Alvarez*, 567 U.S. 709 (2012) issued a fragmented opinion in which it applied intermediate scrutiny to a statute regulating false statements. The statements that MVA wishes to make are the same type of verifiably false statements considered by the *Alvarez* court. If MVA's statements are entitled to First Amendment protection at all, the statute regulating those statements is subject to at most intermediate scrutiny, which it passes. Because MVA's statements are not political, it is *Alvarez* that controls this Court's analysis rather than this Court's decision in *281 Care Committee v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014).

But even should this Court decide that Section 211B.075 is subject to strict scrutiny, the statute passes that test because it is narrowly tailored to address Minnesota's compelling state interest in securing the integrity of its elections process.

## ARGUMENT

MVA faces a paradox in its appeal to this Court. MVA insists that its speech is not materially false and is not intended to impede the exercise of anyone's right to vote. If those things are true, then Section 211B.075 does not prohibit MVA's speech and its Amended Complaint

fails to state a claim for relief.  If, on the other hand, MVA's speech is materially false, then that speech is either not entitled to First Amendment protection at all or is entitled to only limited First Amendment protection.  Either way, MVA's appeal fails.

MVA works hard to present its speech as an academic debate in the public square about the political question of whether felons *should be* allowed to vote.  But that is not what MVA wants to say and it is not what Section 211B.075 prohibits.  There is a sizable distinction between speech saying, "felons *should not* be allowed to vote" and speech saying "felons *are not* allowed to vote."  Speech about whether felons *should be* allowed to vote is political speech.  Speech about whether felons actually *are* allowed to vote is speech about existing election procedures.  Those two statements are fundamentally different, and must be treated differently.

Section 211B.075 by its terms does not regulate speech about whether felons *should be* allowed to vote.  MVA may offer its opinion on that subject to whomever it likes.  What Section 211B.075 does prohibit is a materially false statement that felons *are not* allowed to vote in Minnesota, when that statement is intended to interfere with an individual's exercise of the right to vote.  That statement is not political

speech; it is a falsehood about who is allowed to participate in Minnesota's electoral process.

MVA knows better than anyone that a state may permissibly ban efforts to mislead voters about election procedures. In 2018, the United States Supreme Court issued its decision in *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018). In that decision, the Supreme Court told MVA that "we do not doubt that the state may prohibit messages intended to mislead voters about voting requirements and procedures." *Id.* at 18, n. 4. That is precisely what the State of Minnesota has done by enacting Section 211B.075, which prohibits materially false speech intended to mislead prospective voters about their eligibility to participate in the electoral process.

County Attorney Johnson did not go looking for a reason to bring an enforcement action against MVA. MVA filed a lawsuit against County Attorney Johnson alleging that it had already made (and intended to continue making) statements about voter eligibility that are inconsistent with Minnesota law. Based on the allegations in MVA's Amended Complaint, County Attorney Johnson filed a counterclaim to determine whether Section 211B.075 had been violated.

MVA spends a great deal of time arguing that the very filing of that counterclaim necessarily means that the speech alleged in its Amended Complaint falls within Section 211B.075. It is important to remember, however, that the record below does not include any findings about the merits of County Attorney Johnson's counterclaim. No party asked the District Court to decide that claim. That is because County Attorney Johnson has always made clear that he needs discovery to determine whether Section 211B.075 has been violated. MVA's Amended Complaint certainly gave County Attorney Johnson good cause to believe that a violation of Section 211B.075 might have occurred. County Attorney Johnson has always freely admitted, however, that further discovery might reveal that MVA's actual speech did not violate the statute with its materiality and intent requirements.

The issues of whether MVA's speech occurred within 60 days of an election, was intended to impede another person from exercising the right to vote, or was known to be materially false are not before this Court. Instead, the only issue presented is whether MVA's own Amended Complaint properly states a claim on which relief can be granted. The

District Court correctly found that it does not. This Court should affirm that decision.

## I. The Amended Complaint Presents Only an As-Applied Challenge

The District Court correctly analyzed MVA's Amended Complaint as containing only an as-applied challenge to Section 211B.075. While MVA claims that it actually brought a facial challenge, the District Court correctly found that MVA failed to plead sufficient facts to support such a challenge. That is because "the focus of MVA's complaint and brief is the way in which the Election Law violates MVA's First Amendment rights. Nowhere does MVA provide an analysis for the Court of the relationship between the Election Law's allegedly unconstitutional applications judged against its legitimate sweep." (App. 335-336; R. Doc. 53; Order, pp. 6-7). That finding is amply supported by both the facts and the law.

Starting with the facts, there is no question that the Amended Complaint focuses entirely on the application of Section 211B.075 to MVA's own speech. MVA wishes to say that "felons still serving their sentences do not have a right to vote in Minnesota," and depending on

when, where, how, and to whom it communicates that false statement, MVA may face prosecution or civil action pursuant to Section 211B.075. That is a straightforward as-applied challenge.

Turning to the law, to state a viable facial challenge MVA would need to plead facts showing that Section 211B.075 not only affected its own constitutional rights, but also the distinct rights of third parties. *See Havlak v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017) ("It is inappropriate to entertain a facial overbreadth challenge when the plaintiff fails to adduce any evidence that third parties will be affected in any manner differently from herself"). Those types of allegations are entirely absent from MVA's Amended Complaint. That pleading focuses solely on MVA's own speech, saying nothing about how Section 211B.075 might be applied to any other person or group.

The District Court raised that very point with MVA's counsel during oral argument, asking counsel to identify what other speech might be swept up in Section 211B.075. (Tr. 37). In response, counsel responded that "we've identified two statements *specific to our clients* in our pleading of the issue about felons and the issue about guardianship." (*Id.*) (emphasis added). MVA has never identified any third-party speech

15

that might be implicated by Section 211B.075.  The only examples MVA

provided in its Amended Complaint, its briefing on the parties' respective

motions, and in oral argument are all taken from MVA's own speech.

That is a quintessential as-applied challenge.

Because MVA's factual allegations consist solely of the speech that

*it* wants to make, it would make no sense to treat MVA's allegations as

anything other than an as-applied challenge.  *See e.g. Animal Legal Def.

Fund v. Reynolds*, 89 F.4th 1065, 1080 (8th Cir. 2024) ("When reviewing a

facial challenge, we do not look beyond the text of the statute, nor do we

examine how the Act applies to a plaintiff's particular circumstances").

MVA's Amended Complaint does not contain anything *other* than

references to its own "particular circumstances."  As this Court has said

before:

> For a federal court to entertain a facial challenge pursuant to
> the First Amendment overbreadth doctrine, there must be a
> realistic danger that the statute itself will significantly
> compromise recognized First Amendment protections of
> parties not before the court.

*Havlak*, 864 F.3d at 912.  Facial challenges have long been disfavored

because they rest on speculation and risk the premature interpretation

of statutes on factual records that have not been fully developed.  *Id.*

That maxim applies with equal force in the context of a challenge under the First Amendment. *See Moody v. NetChoice, LLC,* 603 U.S. 707, 743–44 (2024) ("Even in the First Amendment context, facial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications").

Litigants typically lack standing to assert the constitutional rights of third parties. *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). To bring a facial challenge, MVA would need to allege facts sufficient to show that "*no set of circumstances* exists under which the statute would be valid." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis in original)). And those facts would need to show that the supposedly unconstitutional applications are "realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Id.*

None of that is contained in MVA's Amended Complaint. That pleading asked the District Court to evaluate Section 211B.075 solely in light of MVA's desire to state that felons cannot legally vote in Minnesota. MVA failed to plead any other examples of protected speech threatened by Section 211B.075, much less any other "realistic" applications showing

the statute would prohibit a substantial amount of protected speech. The District Court therefore properly confined its analysis to the actual speech pled in the Amended Complaint.

## II. The District Court Correctly Found that MVA's Speech May Not Implicate Section 211B.075

### A. The Amended Complaint denies that MVA violated the statute

The District Court correctly found that MVA's as-applied challenge fails because the speech that MVA alleges in its Amended Complaint might not even fall within the challenged statute. (App. 336-337; R. Doc. 53; Order, pp. 7-8). The District Court noted that discrepancy, writing that "MVA's argument assumes without explaining how its speech violates the Election Law. MVA points to [County Attorney] Johnson's counterclaims, arguing that because Johnson counterclaims under the Election Law, MVA's speech must violate it. But Johnson is not the arbiter of the meaning of the statute, and MVA does not provide an analysis for the Court of how its speech fits within the confines of the Election Law." (App. 335; R. Doc. 53; Order, p. 6, fn. 4). MVA's Amended Complaint fails to state a viable claim because it contains an as-applied

challenge premised on statements that do not necessarily violate the statute.

MVA's Amended Complaint alleges that MVA is not making materially false statements and does not intend those statements to impede or prevent any person from exercising the right to vote. (App. 18; R. Doc. 13; AC, ¶59). MVA further alleges that it has "never directly or indirectly threatened damages, harm, or loss against any person for their decision to register to vote, vote, or assist another in registering or voting." (*Id.*, ¶61). MVA denies that it has ever "intended to impede any person" from casting a ballot or participating in the election process. (*Id.*, ¶63). MVA alleges that it has "never intended to impede or prevent another person from exercising the right to vote." (*Id.*, ¶65). In fact, MVA alleges that its only public statements on this topic have been in court filings:

> 70. In fact, Plaintiffs' only public statements related to the eligibility to vote of felons who have not completed their sentences identified in the original Complaint referred to the State Court Lawsuit and this lawsuit…

(*Id.*, ¶70).

MVA repeated those claims at oral argument. MVA's counsel argued that MVA's speech was "not directed at any voter" and consisted solely of statements made "essentially in court filings and in statements to the media." (Tr. 47). MVA's counsel assured the District Court that there was "absolutely no evidence or any allegation—and, in fact, I think there's a contrary allegation—that this type of speech is…going to be directed towards any individual in particular." (Tr. 56).

On a Rule 12 motion, the District Court was required to accept as true MVA's own allegations about its speech. *See e.g. Clobes v. 3M Co.*, 106 F.4th 803, 806-07 (8th Cir. 2024) ("We review de novo a grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6), accepting as true all factual allegations in the light most favorable to the nonmoving party"). Accepting those allegations as true, the District Court correctly held that MVA's proposed speech does not fall within Section 211B.075 because MVA specifically denies two of the essential elements necessary for the statute to apply.

First, MVA denies that it intends to impede or prevent any person from exercising the right to vote. Second, MVA alleges that it believes its statements are materially true. MVA's as-applied challenge fails

because MVA has not alleged any speech that falls within the statute's restrictions, leaving MVA without standing to bring an as-applied challenge. "To establish Article III causation in an as-applied challenge, a plaintiff must show that its injury is fairly traceable to a challenged statutory provision, meaning a plaintiff does not have standing to challenge a policy that was not applied to it. Thus, a plaintiff generally cannot prevail on an as-applied challenge without showing that the law has in fact been (or is sufficiently likely to be) unconditionally applied to him." *Miller v. City of Excelsior*, 618 F. Supp. 3d 820, 840 (D. Minn. 2022) (quoting *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 888 (8th Cir. 2021) and *McCullen v. Coakley*, 573 U.S. 464, 485 n. 4 (2014)); *see also Jensen v. Minn. Board of Medical Practice*, 2024 WL 1345174 at *3 (D. Minn. 2024) ("Standing requires allegations that plausibly show there has been, or will be, a chilling effect on Jensen's speech, and that chilling effect must be objectively reasonable"); *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) (Plaintiff could not proceed with as-applied challenge once charges against plaintiff were dismissed with prejudice).

### B. MVA cannot rely on the counterclaim

MVA simply assumes that Section 211B.075 must apply to the statements in its Amended Complaint because County Attorney Johnson filed a counterclaim. But as the District Court correctly noted, those are two entirely distinct issues. MVA's Amended Complaint certainly gave County Attorney Johnson reason to suspect that MVA might have violated the statute. MVA commenced its lawsuit less than 60 days prior to the scheduled 2023 election. Faced with MVA's stated intention to deny that felons are eligible to vote under Minnesota law, County Attorney Johnson reasonably believed that a counterclaim was necessary to ensure that the 2023 election proceeded without interference, at least in Anoka County. When MVA amended its Complaint in October, County Attorney Johnson did the same with his counterclaim.

But nothing happened with the counterclaim from that point forward. County Attorney Johnson did not seek a preliminary injunction against MVA or otherwise ask the Court to rule on his claim. Nor did MVA move to dismiss the counterclaim or otherwise challenge it on the merits. Instead, County Attorney Johnson unilaterally agreed not to pursue his claim while the District Court considered the defendants'

dispositive motions.  (App. 246; R. Doc. 43-1).  The District Court has never had occasion to consider the counterclaim's merits.

For that reason, there is nothing in the record about whether MVA's alleged speech was (1) made within 60 days of an election, (2) was known by MVA to be materially false, or (3) was made with the intent to impede or prevent a person from exercising the right to vote.  County Attorney Johnson would need to prove each of those elements before he could prevail on his counterclaim.  After discovery, it may turn out that MVA's speech actually does not violate the statute at all, just as MVA alleges.  There is a large distinction between information sufficient to form a good-faith basis to bring a claim and information necessary to prove that claim.  While County Attorney Johnson might doubt the veracity of MVA's allegations that it has not knowingly made any false statements with the intent to impede another from voting, for purposes of this appeal those statements must be accepted as true.  And if those statements are true, then MVA's Amended Complaint fails to allege a violation of the statute for which it could be held responsible.  This Court need not go any further.

### III. MVA's Proposed Speech is Not Entitled to Any First Amendment Protection

If this Court agrees that MVA presents an as-applied challenge and the speech alleged in its Amended Complaint does not fall within Section 211B.075, then there is nothing else for this Court to decide. This Court should, of course, avoid resolving constitutional questions if a narrower ground exists to decide a case. *See Xiong v. Lynch*, 836 F.3d 948, 950 (8th Cir. 2016) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"). This Court need not delve into the intricacies of the First Amendment if it finds that the operative pleading does not state a viable claim for relief because it fails to allege a violation of the statute it challenges.

Should this Court decide, however, that it must reach the question of whether Section 211B.075 infringes upon MVA's First Amendment rights, then it should start by determining whether MVA's proposed speech is entitled to First Amendment protection at all. Federal courts have long recognized that there are certain types of speech that are not

entitled to First Amendment protection.[3]  The Supreme Court examined

that exact question in *Alvarez*, 567 U.S. 709.

The *Alvarez* court considered the constitutionality of the Stolen

Valor Act (18 U.S.C. § 704), which prohibited individuals from falsely

claiming they had been awarded military decorations.  *Id.* at 714–15.

Alvarez challenged that statute as a content-based restriction that

violated the First Amendment.  *Id.*  In the course of deciding that

challenge, the court noted that there are some types of speech that are

not entitled to First Amendment protection.

The four-Justice plurality opined that "content-based restrictions

on speech have been permitted, as a general matter, only when confined

---

[3] Much of MVA's argument about whether its alleged speech enjoys First Amendment protection consists of arguments that it failed to properly raise before the District Court.  The District Court noted that "MVA makes a number of arguments in its 46-page reply brief on its motion for preliminary injunction that it either did not make or only cursorily addressed in previous briefing on the motions to dismiss and for judgment on the pleadings." (App. 336; R. Doc. 53; Order, p. 7, fn. 5).  The District Court specifically refused to rule on arguments raised for the first time in a reply brief.  (*Id.*).  This Court should also refuse to consider new arguments not properly raised below.  As this Court considers MVA's challenge to Section 211B.075, it should confine MVA to only those arguments that it properly raised before the District Court.

to the few historic and traditional categories of expression long familiar to the bar." *Alvarez*, 567 U.S. at 717. The two concurring justices disagreed with that limitation, however, meaning that a content-based restriction need **not** fall solely within those historical categories to pass muster under the First Amendment. *See United States v. Mackey*, 652 F. Supp. 3d 309, 342 (E.D.N.Y. 2023) ("[T]he *Alvarez* concurrence controls with regard to its rejection of the strict historical categorical approach, where exceptions to First Amendment protection are limited solely to the enumerated historical exceptions, as the plurality only secured four votes for that point"). Even the *Alvarez* court's plurality agreed that there could be constitutional content-based restrictions that prohibit "some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed . . . in our case law." *Alvarez*, 567 U.S. at 722 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

The speech prohibited by Section 211B.075 falls within "the few historic and traditional categories of expression" which lack First Amendment protection. That statute targets false speech undertaken to accomplish the legally cognizable harm of interfering with Minnesota's

election process.  Section 211B.075 only regulates speech that both the Supreme Court and this Court have held falls outside the protections of the First Amendment.

### A. Fraud

"[T]he First Amendment does not shield fraud."  *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980).  States need not "sit idly by and allow their citizens to be defrauded." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

Imposing consequences for fraud has "never been thought to raise any Constitutional problem."  *Stevens*, 559 US at 468.  "Fraudulent misrepresentations can be prohibited." *Vill. of Schaumburg*, 444 U.S. at 637.  The *Alvarez* concurrence agrees, noting that "many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful."  567 U.S. at 734.  Statutes criminalizing fraud, defamation, or perjury all pass constitutional muster because they are limited "to a subset of lies where specific harm is more likely to occur." *Id.* at 736.  As one federal court has summarized, "fraudulent

misrepresentations of fact are unprotected by the First Amendment . . . " *Aitken v. Commc'ns Workers of Am.*, 496 F. Supp. 2d 653, 665 (E.D. Va. 2007).

At its essence, Section 211B.075 prohibits fraud. It prohibits actors from (1) causing information to be transmitted (2) with the intent to impede or prevent another person from exercising the right to vote, and which the actor (3) knows to be (4) materially false. Those elements track with the common law elements of fraud and fraudulent misrepresentation. *See e.g. U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011); *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1493 (8th Cir. 1992) (applying Minnesota law for fraudulent misrepresentation claim).

To be clear, nothing prohibits MVA from expressing opinions about who it thinks *should be* allowed to vote. Section 211B.075 only applies when an actor intentionally communicates false statements about "information regarding the time, place, or manner of holding an election; the qualifications for or restrictions on voter eligibility at an election; and threats to physical safety" within 60 days of an election. MVA can challenge without restriction the policy, impact, or wisdom of re-

enfranchising certain voters.  Under Section 211B.075, subd. 2, however, it cannot fraudulently tell individuals whom the legislature has deemed eligible that they are, in fact, ineligible.  That is a form of fraud on the public.

In *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147 (1939), the Supreme Court considered four separate ordinances which prohibited leafletting on public streets and sidewalks.  The court noted that free speech necessarily comes with some limits attached:

> For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets.

*Id.* at 160–61.  Six decades later, the Supreme Court would make that point again.  *See Illinois*, 538 U.S. at 612.  The court in *Illinois* held that states and local municipalities may prohibit fraudulent solicitation, even when the speech is dressed in the sheep's clothing of religion, charity, or even politics.  "Frauds including fraudulent appeals . . . *made in the name*

*of charity and religion*, may be denounced as offenses and punished by law." *Id.*

This Court itself has made clear that states can proscribe this type of fraudulent speech. In 2012, considering federal statutes criminalizing false and malicious statements about the commission of serious crimes, this Court cited the plurality opinion from *Alvarez* and commented, "The falsities governed here have no value in and of themselves, are necessarily injurious and do not 'chill' otherwise valuable or protected speech. These statutes criminalize only those lies that are particularly likely to produce harm." *U.S. v. Williams*, 690 F.3d 1056, 1063 (8th Cir. 2012). The same holds true here. Minnesota need not sit idly by while individuals spread targeted misinformation about who can and cannot vote.

### B. False statements leading to harm

Even if a materially false statement made with the intent to impede an individual from exercising the lawful right to vote were not fraud, it could still be regulated as a false statement made with the goal of accomplishing a legally cognizable harm. The *Alvarez* court recognized that states may regulate "false speech undertaken to accomplish a legally

cognizable harm." *Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021). To the extent Section 211B.075 could include speech beyond pure fraud, it still falls within this class of nonprotected speech because the statute targets speech intended to harm the ability of eligible voters to cast their ballots.

This Court elaborated on the *Alvarez* court's finding in its own *Reynolds* decision, which considered a statute imposing criminal penalties on anyone who willfully "[o]btains access to an agricultural production facility by false pretenses." *Reynolds*, 8 F.4th at 783. This Court surveyed *Alvarez* and concluded that while "falsity alone may not suffice to bring speech outside the First Amendment, . . . [t]he better rule in light of *Alvarez* is that intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment." *Id.* at 786; *see also 281 Care Comm.*, 766 F.3d at 783 (noting the "legally cognizable harm" distinction in *Alvarez*).

In January 2024, this Court addressed that issue again in *Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1065 (8th Cir. 2024) (*Reynolds II*). In its first *Reynolds* decision, this Court found constitutional that

portion of the statute that prohibited using false pretenses to access an agricultural production facility, but struck down as unconstitutional a second portion of the same statute that prohibited false statements made as part of an application to work in such a facility because that prohibition was insufficiently tailored. *Id.* at 1067. The Iowa legislature sought to address that problem by passing a new law that forbade the use of false statements "on a matter that would reasonably result in a denial of an opportunity to be employed" and by adding an intent element to the statute, such that the law forbade the use of deceptive statements only when a prospective employee made those statements to gain employment "with the intent to cause physical or economic harm or other injury" to the facility. *Id.* This Court found that those changes made the employment portion of the statute constitutional as well.

In *Reynolds II*, this Court again held that false or deceptive speech "is not *per se* unprotected, but the State may proscribe intentionally false speech undertaken to accomplish a legally cognizable harm." *Id.* at 1068. Whereas the original employment portion of the statute regulated some speech that might have been protected by the First Amendment, the new statute eliminated that concern by adding an intent requirement. The

organizations challenging the new law argued, as MVA does here, that the intent requirement itself was content or viewpoint-based. *Id.* at 1070.[4] This Court rejected that argument:

> The intent element determines whether particular conduct violates the statute, but it does not mean that a violation turns on the viewpoint of an offender's deceptive speech. Rather, the intent requirement permissibly reflects the general view that criminal punishment should be reserved for those who intend the harm they commit.

*Id.* at 1070. The same is true with Section 211B.075. That statute has nothing to do with a speaker's viewpoint or the content of the speaker's message. The statute uniformly prohibits materially false statements intended to impede the exercise of another's lawful right to vote, regardless of the content of the false statement.

---

[4] MVA's argument that the law is viewpoint-based because it allows false statements that an individual *can* vote but not false statements that an individual *can't* vote makes no sense in the elections context. If an individual who is not eligible to vote (a 16-year-old or Wisconsin resident, for example) receives false information that voting is allowed, nothing will happen because there are extensive safeguards in place to prevent ineligible voters from casting a ballot. If an eligible voter is told she cannot vote, however, that vote is lost forever. And even if Section 211B.075 does not address MVA's hypothetical concern about ineligible voters casting ballots, the legislature does not engage in viewpoint discrimination by addressing one problem instead of another.

"Courts routinely recognize that restrictions on voting rights constitute irreparable injury." *Craig v. Simon*, 493 F. Supp. 3d 773, 786 (D. Minn.), *aff'd*, 980 F.3d 614 (8th Cir. 2020). The "right to vote is 'the most basic of political rights,'" *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) (quoting *FEC v. Akins*, 524 U.S. 11, 25 (1998)). The "deprivation of the right to vote is just such a concrete [injury in fact]." *Id.* at 425.

Section 211B.075 also prevents a second type of harm—interference with government election processes. *See Mackey*, 652 F. Supp. 3d at 348 ("[T]he *Alvarez* plurality appears to essentially describe one such category without naming it—that of false speech injuring the integrity of Government processes"). False speech about who is eligible to vote not only injures prospective voters, but it also directly injures the government's interest in conducting free and fair elections. Because the proscriptions of Section 211B.075 are limited to false speech undertaken to accomplish legally cognizable harms, that statute passes constitutional muster.

**C. True threats**

Finally, Section 211B.075 is constitutional because it prohibits another historical category of speech not entitled to First Amendment protection: true threats. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Courts certainly differentiate "political hyperbole" from "true threats," but it is equally true that "political context alone will not excuse a threat." *United States v. Dierks*, 978 F.3d 585, 589 (8th Cir. 2020).

In *National Coalition on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D. N.Y. 2023), the court held that defendants' robocalls constituted true threats. "The Robocall, that is, the speech at issue, put a reasonable recipient familiar with the context of the Robocall in fear that an injury of a legal (arrest), economic (debt collection), or physical (mandatory vaccination) nature would occur if the recipient voted by mail." *Id.* at 119. The law does not demand that restraints on true threats can only protect individuals from physical violence; they can

"protect individuals from the fear of violence and the *disruption that fear engenders.*"  *Id.* at 118.  The subtext of telling a voter "you cannot vote legally" is obvious: "if you vote, you will commit a felony."  *See* Minn. Stat. § 201.014, subd. 3.  Saying the former is saying the latter. And the latter is a threat of arrest, prosecution, and jail time.  Section 211B.075 prohibits just those sorts of true threats.

## IV. If the First Amendment Applies, Then Section 211B.075 Must Be Evaluated Under Intermediate Scrutiny

### A. The Supreme Court's *Alvarez* Opinion

If this Court finds that Section 211B.075 regulates speech that is entitled to some First Amendment protection, then this Court must decide what level of scrutiny applies.  To answer that question, this Court must return to the Supreme Court's decision in *Alvarez*.  The *Alvarez* court agreed that the Stolen Valor Act was unconstitutional but did not issue a true majority opinion.  Instead, four justices signed on to the court's plurality opinion, with two other justices concurring in the result but writing separately to mark their disagreement with some of the plurality's reasoning.  Three justices dissented because they found nothing unconstitutional about the act's regulation of false statements of

fact. "Where, as in *Alvarez,* a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Mackey*, 652 F. Supp. 3d at 342 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).

The court's plurality and concurring opinions must be read carefully to determine the true extent of the court's binding holding. Only four justices believed that strict scrutiny was the proper standard to apply. Rather than applying strict scrutiny, the two-Justice concurrence held that the Court needed to "examine the fit between statutory ends and means." *Alvarez*, 567 U.S. at 730. The concurrence concluded that "in this case, the Court's term 'intermediate scrutiny' describes what I think we should do." *Id.* Only intermediate scrutiny should be applied to the type of verifiably false statements that Section 211B.075 prohibits:

> [T]here are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like raise such concerns, and in many contexts have called for strict scrutiny. But this case does not involve such a law. The dangers of

suppressing valuable ideas are lower where, as here, the regulations concern false statements about easily verifiable facts that do not concern such subject matter. Such false factual statements are less likely than are true factual statements to make a valuable contribution to the marketplace of ideas. And the government often has good reasons to prohibit such false speech.

*Id.* at 731–32. While the concurrence rejected the plurality's application of strict scrutiny, it nevertheless concurred with the plurality's judgment because it found that the Act was not sufficiently tailored to fit the government's interest. *Id.* at 739.

To summarize the *Alvarez* court's holding, a law regulating verifiably false speech receives **at most** intermediate scrutiny. If a law regulates false speech falling within a historical exception, then all nine justices agreed that it would not implicate the First Amendment at all. While six justices invalidated the Stolen Valor Act under differing standards, the narrowest ground on which the court reached that result was that the Act failed the intermediate scrutiny test described by the concurrence. That holds true because strict scrutiny is the most restrictive First Amendment test available to the court and necessarily encompasses the less restrictive intermediate scrutiny test. The narrowest ground on which five or more justices agreed in *Alvarez* was

the application of intermediate scrutiny to verifiably false statements. That is the standard that this Court should apply.

## B. The *Mackey* and *Wohl* decisions

The Eastern District of New York comprehensively addressed the interplay between the First Amendment and the government's compelling interest in prohibiting false statements designed to interfere with the fundamental right to vote in its *Mackey* decision. Mackey was indicted for his participation in an online conspiracy to make false statements about election procedures in the 2016 presidential election. *Mackey*, 652 F. Supp. 3d 309. A grand jury concluded that Mackey violated that statute by making social media posts designed "to trick [Hillary Clinton's] supporters into believing they could cast their ballots by sending a text message or posting on Facebook or Twitter." *Id.* at 319. Mackey moved to dismiss the indictment, arguing that Section 241 interfered with the exercise of his First Amendment rights.

The district court held that Section 241 did not violate the First Amendment as applied to Mackey's dissemination of materially false information about the voting process itself. Following *Alvarez*, the *Mackey* court applied intermediate scrutiny to the social media posts

before it because the statements related to "easily verifiable facts" and were likely to "make a specific harm more likely to occur." *Mackey*, 652 F. Supp. 3d at 342. That court rejected Mackey's argument that his social media posts constituted political speech and were therefore entitled to a higher degree of First Amendment protection:

> Courts have, on the other hand, been deferential to government regulation of speech that is not *political* in nature and is instead related to politics only in so far as it proscribes the procedures governing elections.

*Id.* at 344. The court found that Mackey's social media posts were not political speech:

> [T]he definition of political speech cannot be one of unlimited scope. The Court's political speech cases have uniformly involved speech and expressive conduct relating to the *substance* of what is (or may be) on the ballot—policy issues, party preference, candidate credentials, candidate positions, putative facts about issues covered by ballot questions, and the like.

*Id.* at 345. Mackey's posts did not advocate for a policy position or a candidate—they sought only to interfere with voters' ability to cast a ballot for the candidate of their choice.

Even if Mackey's posts were treated as pure speech divorced from his intent to disenfranchise eligible voters, those false statements should still be examined under intermediate scrutiny. As the court explained:

> Like Mr. Alvarez's claims that he held the Congressional Medal of Honor, Mr. Mackey's claims that Democrats could vote for President by text were indubitably false, with no room to argue about interpretation or shades of meaning. But unlike Mr. Alvarez's claims, Mr. Mackey' tweets do not even arguably constitute pure speech. This prosecution targets only false speech intentionally used to injure other individuals' attempt to exercise their constitutionally guaranteed right to vote…despite Mr. Mackey's knowledge that the statements in his tweets were false.

*Id.* The *Mackey* court noted that even the plurality opinion in *Alvarez* recognized that "regulation of such speech regarding election procedures properly falls into the very different category of false speech regarding the efficient administration of government processes . . . ." *Id.* at 346.

Applying intermediate scrutiny, the court explained that the statute was constitutional because there was a fit between the statute and the government's interest in regulating the speech in question. *Id.* at 347. The state has a compelling interest in maintaining the integrity of its election procedures, including how to vote, when to vote, and where to vote. *Id.* The statutory restriction fit the government's interest

because it was limited to verifiably false statements that could not be countered by true speech, given the potential to mislead voters about the voting process in the period immediately preceding an election. *Id.*

Just a few weeks after the *Mackey* decision, the United States District Court for the Southern District of New York applied the same analysis to find that robocalls making false claims about voting procedures were also not entitled to First Amendment protection. In *Wohl*, Defendants falsely advised recipients that if they voted by mail (1) their personal information would be added to a public database used by police departments to track down old warrants, (2) their personal information could be used by credit card companies to collect outstanding debts, and (3) the Centers for Disease Control would use that information to "track people for mandatory vaccines." *Wohl,* 661 F. Supp. 3d at 114. Defendants argued that the calls were protected by the First Amendment.

Like the *Mackey* court, the *Wohl* court found that at most only intermediate scrutiny applied. *Id.* at 119. The court found that "the federal government and the State of New York have an interest in protecting voting rights and maintaining the integrity of the election

process, rising to the level of a compelling interest." *Id.* at 121. The statute at issue was tailored to fit that interest, and thus survived defendants' First Amendment challenge. *Id.*

### C. Section 211B.075 does not regulate political speech

MVA argues that its speech is different than the speech considered in *Alvarez*, *Mackey*, and *Wohl* because even if its speech is false, it is also political. That is because MVA's speech supposedly relates to the "hot-button political issue" of whether felons should be allowed to vote. (Appellant's Brief, p. 10). MVA misunderstands what constitutes political speech. Section 211B.075 does not in any way prevent Plaintiffs from advocating whatever they think the law *should be*. Instead, that statute only prevents Plaintiffs from misrepresenting what Minnesota law *actually says*. The first type of speech might be considered political, but the second plainly is not. MVA's proposed speech does not reach the merits of the political question of whether felons should be allowed to vote; it goes only to the non-political process by which Minnesota administers elections.

Almost 60 years ago, the Supreme Court explained:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The right to vote, in turn, means "the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992).

The Supreme Court has "recognized that, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). The Supreme Court has repeatedly upheld such restrictions against challenges that they violate the First Amendment:

> To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Id.* at 789. "Just as a State may take steps to ensure that its governing political institutions and officials properly discharge public responsibilities and maintain public trust and confidence, a State has a legitimate interest in upholding the integrity of the electoral process itself." *Brown v. Hartlage*, 456 U.S. 45, 52 (1982); *see also Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231–32 (1989) ("A state indisputably has a compelling interest in preserving the integrity of its election process."); *281 Care Committee,* 766 F.3d at 787 ("We concede that regulating falsity in the political realm definitely exemplifies a stronger state interest than, say, regulating the dissemination and content of information generally, given the importance of the electoral process in the United States").

The state's interest in protecting the integrity of its electoral process is especially compelling when it comes to regulating false statements about who is allowed to participate in that process. After reviewing numerous federal court decisions, one commentator has concluded that "the strongest case for constitutionality is a narrow law targeted at false election speech aimed at disenfranchising voters."

Richard L. Hasen, *A Constitutional Right to Lie in Campaigns and Elections?*, 74 Mont. L. Rev. 53, 71 (2013). Another commentator has noted the serious harm that can be inflicted on voters by those who lie about the elections process:

> By way of example, imagine a poll worker intentionally provides false instruction about how to operate a voting machine. Or a situation in which campaign volunteers, engaged in get-out-the-vote efforts, intentionally mislead prospective voters, whom they believe to oppose their preferred candidate, about their voting eligibility. These lies are uniquely harmful. Professor Richard Hasen, after providing the example of an individual falsely informing listeners that 'Republicans vote on Tuesday, Democrats vote on Wednesday,' sees little significance in such lies: "A state should have the power to criminalize such speech. The law would be justified by the government's compelling interest in protecting the right to vote.' As Professor James Weinstein notes in his contribution to this symposium, and in making a similar point, 'if government were powerless to stop such deception, the integrity of the election process might be badly compromised.' Typical concerns about chilling valuable speech are, in this circumstance, flimsy.

Joshua S. Sellers, *Legislating Against Lying in Campaigns and Elections*, 71 Okla. L. Rev. 141, 159 (2018).

That is why MVA's argument that *281 Care Committee* requires a different result rings hollow. That decision does not bind this Court because that case considered quintessential political speech that dealt

with statements about the merits of a ballot initiative. *See id.* at 783 ("The key today, however, is that although *Alvarez* dealt with a regulation proscribing false speech, it did not deal with legislation regulating false *political* speech. *This distinction makes all the difference and is entirely* the reason why *Alvarez* is not the ground upon which we tread") (emphasis added).

The speech affected by Section 211B.075 is not political speech at all. Not all speech about political issues constitutes political speech. Plaintiffs' speech is not political, for two reasons. First, Plaintiffs' false statements about who is eligible to vote in Minnesota relate squarely to Minnesota's election procedures. Laws that regulate the who, what, where, and when of an election do not target political speech.

Second, political speech relates to the *substance* of an issue presented to voters—"policy issues, party preference, candidate credentials, candidate positions, putative facts about issues covered by ballot questions, and the like." *Mackey,* 652 F. Supp. 3d at 345. Plaintiffs' speech is not political because it does not relate to the substance of a political issue in any way, through a ballot question or otherwise. No one has suggested that MVA would violate Section 211B.075 by advocating

in any forum that the Minnesota legislature erred by allowing felons to vote. What is not political speech, however, is Plaintiffs' statement that "felons who have not served their full sentences, or otherwise had their sentences discharged, cannot legally vote." (App. 2; R. Doc. 13; AC ¶5). That statement does not relate to the substance of the political issue about whether felons *should be* allowed to vote. Instead, it misstates existing Minnesota law, just as if MVA were to tell prospective voters that elections take place on Wednesdays instead of Tuesdays, or that Minnesota polls close at noon rather than 8 pm.

Speech (even false speech) made to persuade voters to vote a particular way is far different than false speech intended to prevent voters from participating in the electoral process at all. For that reason, *281 Care Committee* does not apply.

## V. Section 211B.075 is Constitutional Under Intermediate Scrutiny

Section 211B.075 passes intermediate scrutiny for the reasons articulated by the *Mackey* and *Wohl* courts. It has always been the case that "demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements." *Hartlage*, 456 U.S. at 60.

The dissent in *Alvarez* made that same point.  *See Alvarez*, 567 U.S. at 746 ("Time and again, this Court has recognized that as a general matter false factual statements possess no intrinsic First Amendment value") (collecting cases).  *Alvarez's* essential holding is that false statements are not excluded categorically from First Amendment protection but simultaneously do not enjoy the same constitutional protection afforded to true statements.  Section 211B.075 regulates the same type of verifiably false statements that the *Mackey* and *Wohl* courts considered. It is a materially false statement for someone to communicate that felons who are still subject to supervised release, probation, or work release are not allowed to vote under Minnesota law.

Section 211B.075 passes intermediate scrutiny so long as it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).  Minnesota plainly has an interest in regulating its elections process.  That is a compelling interest that has been recognized numerous times by federal courts.  *See, e.g., Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 15-16 (2018) ("The State

may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth[.]"); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 788–89 (1978) (recognizing the state's interest in "preserving the integrity of the electoral process, preventing corruption, and sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government.").

When considering similar laws, federal courts have identified several characteristics that make a law constitutional. The concurrence in *Alvarez* traced the history of constitutionally acceptable statutes that limit speech in other contexts. *Alvarez*, 567 U.S. at 734–36. Those regulations are acceptable in large part because they are tailored:

> [I]n virtually all these instances limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur. The limitations help to make certain that the statute does not allow its threat of liability or criminal punishment to roam at large, discouraging or forbidding the telling of the lie in contexts where harm is unlikely or the need for the prohibition is small.

*Id.* at 736. A statute that "insist[s] upon a showing that the false statement caused specific harm or at least was material, or focus[es] its coverage on lies most likely to be harmful or on contexts where such lies

are most likely to cause harm" is properly tailored. *Id.* at 738. A constitutional statute should also "contain at least an implicit requirement that the statement be *knowingly* or *intentionally* false." *Mackey*, 652 F. Supp. 3d at 343 (emphasis in original). Section 211B.075 bears all those hallmarks.

First, Subdivision 2 (what the District Court termed the "heart" of MVA's Amended Complaint) applies only to information transmitted within 60 days of an election. That limitation makes the statute a very narrow one, targeted to prevent just those false statements that cannot readily be countered with true counter-speech because there is not sufficient time to widely circulate such true statements. Outside the 60-day window, subdivision 2 does not prevent the dissemination of even materially false statements about who may vote in an election. The legislature has determined that if a prospective voter receives such a false message outside that window, the state will have sufficient time to educate that individual about her eligibility to vote. That line-drawing shows that the legislature tailored this remedy carefully.

Second, the statute imposes an intent requirement. The statute applies only to false statements intended to interfere with a convicted

felon's right to participate in an election. That limitation is significant because it exempts communications not intended to affect a third-party's exercise of the right to vote. Third, the statute only prohibits statements known by the speaker to be materially false. The statute does not target false statements made with the good-faith belief that they are true.

Those three limitations significantly narrow the reach of Section 211B.075, subd. 2. MVA also complains about Subdivision 5, which grants a narrow enforcement right to members of the public, but only to those persons "injured by an act prohibited by this section." Because the statute addresses interference with the right to vote, only an individual who has been the subject of speech or conduct intended to interfere with that individual's participation in an election receives a private right of action. That limitation greatly narrows the universe of potential plaintiffs and fits the state's legitimate interest in protecting the electoral process.

For all its bluster, MVA does acknowledge that "it may be true that intentional attempts to mislead voters about voting requirements and procedures could be barred…" (Appellant's Brief, p. 41). In fact, MVA readily admits that "the *Mansky* Court may have meant that state laws

can proscribe individuals from sending false messages to voters intentionally designed to mislead them as to, say, the hours or dates for voting." (*Id.*, p. 42). MVA conceded below that states can prohibit people from "misleading voters with false statements of readily verifiable and indisputable facts as to the nuts and bolts of Election Day (or early voting)." (App. 182-183; R. Doc. 32; MVA Response Brief, pp. 28-29).

But that is *exactly* what Section 211B.075 prohibits. Section 211B.075 does not bar newspaper editorials advocating that felons should not be allowed to vote. Nor does that statute allow just any member of the public to sue those who disagree with their politics. Instead, the statute prevents only the knowing use of materially false information to interfere with eligible voters' exercise of their voting rights. MVA postulates a statute that does not contain any of those guardrails, but that is not what the legislature actually passed. MVA works hard to make this case just like *Mansky*, but it is plainly different. MVA is not wearing a proverbial button saying "felons shouldn't be allowed to vote." What MVA wants to do is stand outside the polling place and tell convicted felons they are *actually not* allowed to vote even though the Minnesota legislature says they can. Just as the state could

prevent individuals from standing in a polling place parking lot and redirecting voters to the wrong polling place, telling voters the election is really tomorrow instead of today, or falsely telling voters that the polls have closed for the night, the state can permissibly prevent individuals from falsely telling eligible voters that they are not eligible to vote. MVA offers no logical reason why a state can permissibly regulate false speech about when and where an election takes place but not false speech about who may vote in that election.

Nor is Section 211B.075 some radical new piece of legislation. That statute builds on Minn. Stat. § 204C.035, which has long provided that "no person shall knowingly deceive another person regarding the time, place, or manner of conducting an election or the qualifications for or restrictions on voter eligibility for an election, with the intent to prevent the individual from voting in the election." That law has been on the books since 2006 without any suggestion it is unconstitutional. Section 211B.075 merely builds on what has long been a non-controversial proposition—the State can prevent the use of false information to interfere with an eligible voter's right to vote. Why should it be the case that the state can prevent the use of materially false information about

the time or place of an election to prevent an eligible voter from voting, but not be allowed to bar false information about that voter's eligibility to vote? MVA never explains why false speech about the time or place of an election can be regulated but false speech about who may participate in an election cannot be.

## VI. Section 211B.075 Also Passes Strict Scrutiny

As the District Court held, even if Section 211B.075 were subject to strict scrutiny it would still be constitutional because it is narrowly tailored to address Minnesota's compelling state interest in preserving the integrity of its elections process. While strict scrutiny is a demanding standard, the Supreme Court has made clear that it is not "fatal in fact." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). The Supreme Court has repeatedly upheld laws after subjecting them to strict scrutiny. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (collecting cases). Section 211B.075 is no exception.

Because the right to vote is so fundamental to American democracy, a state has a compelling interest in preserving the integrity of its elections process. That compelling interest extends to protecting prospective voters from confusion about their right to vote:

> [T]his Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence. The Court also has recognized that a State indisputably has a compelling interest in preserving the integrity of its election process. The Court thus has upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.

*Burson v. Freeman*, 504 U.S. 191, 199 (1992). This Court has also recognized that interest. *See 281 Care Committee*, 766 F. 3d at 786 ("It is true that a State indisputably has a compelling interest in preserving the integrity of its election process. And, interests in protecting elections conducted with integrity and reliability obviously are compelling"). The state's compelling interest in protecting its elections process becomes even stronger when the state seeks to "regulat[e] falsity in the political realm." *Id.* at 787. That is especially true when a state seeks to protect the act of voting itself, because "it is obvious the protection of voters from confusion, undue influence, intimidation, and election fraud are compelling state interests." *Frank v. Lee*, 84 F.4th 1119, 1140 (10th Cir. 2023).

The *Wohl* court relied on that exact reasoning to conclude that the statute before it survived strict scrutiny. *Wohl*, 661 F. Supp. 3d at 121 ("The statute, as applied to Defendants' utterances, is constitutional as

it serves a compelling government interest in preventing voter intimidation and protecting election processes, and is the least restrictive means in serving that interest, as it does not restrict any more speech than necessary to achieve the government's objectives"). Section 211B.075 furthers Minnesota's compelling interest in ensuring that its eligible voters are not deprived of their right to vote through the use of materially false information about their eligibility.

The law is also narrowly tailored to advance that compelling interest. "It bears emphasis that, under the strict-scrutiny standard, a restriction must be narrowly tailored, not perfectly tailored." *TikTok Inc. v. Garland*, 122 F.4th 930, 961 (D.C. Cir. 2024); *accord Williams-Yulee*, 575 U.S. at 454. The District Court correctly held that Section 211B.075 is narrowly tailored because it "merely reaches speech about where, when, and who can vote. The law is limited to statements that a person knows to be materially false, and made with intent to prevent someone from voting." (App. 339; R. Doc. 53; Order, p. 10). On top of those limitations, the law applies only to speech made within 60 days of an election. Those guardrails severely restrict that law's reach.

MVA posits a parade of horribles arising from Section 211B.075. MVA suggests that individuals could face litigation if they advocate a position in court. It claims that it could be prosecuted merely for expressing its opinions in public. (Appellant's Brief, p. 27). But MVA is arguing about a statute that does not exist, rather than the law actually passed by the Minnesota legislature. Section 211B.075 by its terms does not extend to opinions. MVA remains free to offer in any forum any opinion it likes about whether felons (or 16-year-olds) *should be* allowed to vote. The statute extends only to statements of fact, and then only to those that are "materially false." MVA's subjective belief about what the law should be does not fall within the terms of the statute. Even if Section 211B.075 extended to MVA's speech at all, it would only restrict materially false statements about actual facts, and even then, only those materially false statements that are intended to actually impede an individual from exercising that individual's right to vote. Even then, those statements fall within the statute only if they are made within 60 days of an election. Those restrictions are more than sufficient to make Section 211B.075 narrowly tailored.

The state need not present any specific evidence to support the need for a regulation such as Section 211B.075. When considering regulations that affect the elections process, the Supreme Court has "permitted states to respond to potential deficiencies in the electoral process with foresight rather than reactivity." *OPAWL v. Yost*, 118 F. 4th 770, 782 (6th Cir. 2024). Because it is difficult to make specific findings about elections that vary so much from year to year, "requiring precise proof of those effects would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)). "The Constitution and common sense aren't enemies." *Id.* As the Tenth Circuit Court of Appeals recently observed:

> The regulation must be reasonable and not significantly impinge on constitutionally protected rights. But a state is not required to prove, with empirical evidence, that an election regulation is perfectly tailored. Rather, in recognition of the deference due to states conducting elections, and because it would be difficult to isolate the exact effect of these laws on voter intimidation and election fraud, courts need only look for a state's explanation why its restriction, whatever it may entail, is what it is.

*Frank v. Lee*, 84 F. 4th 1119, 1140 (10th Cir. 2023). For that reason, a state need not present detailed evidence about how a given election

regulation ensures an orderly elections process, particularly where the regulation obviously advances the state's compelling interest. To do anything else would require a state "to allow incremental damage to its political system before arriving at the proper level of regulation." *Clark v. Schmidt*, 493 F. Supp. 3d 1018, 1033 (D. Kan. 2020).

Minnesota was not required to wait until individuals used materially false information to prevent eligible citizens from voting before it enacted legislation to prevent that harm. It is common sense that the state has a compelling interest in ensuring that eligible citizens are able to cast their votes without interference. Section 211B.075 does no more than prohibit the very statements "intended to mislead voters about voting requirements and procedures" that the Supreme Court discussed in *Mansky*.

MVA argues that Section 211B.075 is not narrowly tailored because subdivision 5 allows enforcement by "any person injured by an act prohibited by this section." MVA postulates that this statute might give rise to spurious claims brought by those who oppose MVA because of its politics. But the potential that a law might be abused does not make it unconstitutional. *See Yost*, 118 F. 4th at 784 ("But a private party's abuse

of a law doesn't make the law unconstitutional, just as a prank 911 call doesn't make an emergency response unlawful"). The state is not required to sit by and allow its citizens to be given materially false information that impedes their ability to vote just because an individual injured by those statements might bring a civil lawsuit against MVA. Civil lawsuits alleging fraud or misrepresentation are frequently brought and not always successful, but there is no suggestion that those laws must be repealed just to prevent innocent parties from having to bear litigation costs.

## VII.     Subdivision 5 Is Not a Prior Restraint

MVA argues that Subdivision 5 of the statute constitutes an impermissible prior restraint on speech because it allows the attorney general, a county attorney, or any injured person to "bring a civil action to prevent or restrain a violation of this section if there is a reasonable basis to believe that an individual or entity is committing or intends to commit a prohibited act." Subdivision 5 is not itself a prior restraint because it does not prevent MVA or anyone else from engaging in speech without government permission. Instead, it merely creates a cause of

action through which a party might *request* a prior restraint from a court. That is an important distinction, as the District Court noted.

"In the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Viewpoint Neutrality Now! v. Board of Regents*, 109 F.4th 1033, 1042 (8th Cir. 2024). But that is not at all what Subdivision 5 does. Subdivision 5 does not require MVA to obtain permission before it is allowed to speak, which would be a prior restraint. What Subdivision 5 does is create a legal claim for a third party to ask a *court* to impose a prior restraint on MVA. Subdivision 5 does not say that every such request must be granted. Instead, it leaves to the judiciary the task of deciding whether a prior restraint should be issued under the facts of a given case. The District Court noted that a judicial prior restraint order can sometimes be constitutional. (App. 341; R. Doc. 53; Order, p. 12). This Court has agreed with that analysis in the case that the District Court cited, *Hershey v. Jasinski*, 86 F.4th 1224, 1234 (8th Cir. 2023). As this Court explained in *Hershey*, while prior restraints come with a presumption against their constitutionality, that presumption can be overcome by "judicial superintendence" and "an

almost immediate judicial determination of the validity of the restraint." *Id.* That is exactly what Subdivision 5 provides. Subdivision 5 says that only a *court* may issue a prior restraint if, in the court's own judgment, such a restraint is consistent with the Constitution. Creating a mechanism whereby a party can ask a court to consider issuing a prior restraint is not at all the same as legislatively imposing a prior restraint via statute.

The best MVA can do is cite a case from the Seventh Circuit to support its claim that "threatening penalties for future speech goes by the name prior restraint." (Appellant's Brief, p. 37). But that case, *Backpage.com, LLC v. Dart*, 807 F. 3d 229 (7th Cir. 2015), shows exactly why Subdivision 5 is not a prior restraint. In *Dart*, the Cook County Sheriff demanded that credit card companies stop allowing their issued cards to be used for purchasing advertisements on Backpage. The Seventh Circuit found that the sheriff's actions constituted an unconstitutional prior restraint on speech by "threaten[ing] legal sanctions against the credit-card companies for facilitating future speech." *Id.* at 231. Importantly, however, the Seventh Circuit made clear that there was a distinction between a government official imposing

his own prior restraint and asking a *court* to impose that restraint. The Seventh Circuit complained that the sheriff "decided to proceed against Backpage *not by litigation* but instead by suffocation." *Id.* (emphasis added). The sheriff's conduct constituted a prior restraint because it did not give Backpage the opportunity to argue its case to a court before its speech was suppressed:

> Had Sheriff Dart sued Backpage seeking to enjoin its publication of sex-related ads, the company's remedy would have been to seek a judgment dismissing the suit. But Backpage is the plaintiff, and its only remedy is an injunction against the sheriff's violating its First Amendment rights.

*Id.* at 238. That is the fundamental difference between the situation presented by *Dart* and the application of Subdivision 5. The *Dart* court considered a government official restraining speech through that official's own conduct. Subdivision 5 does not authorize the Attorney General, a county attorney, or any private citizen to themselves suppress MVA's speech. That subdivision does no more than create a pathway for those groups to ask a *court* whether a prior restraint is justified under the facts of a particular case. That distinction makes all the difference.

Even if Subdivision 5 did impose an impermissible prior restraint, however, that restraint could be severed from the statute leaving the rest

64

intact.  *See Styczinski v. Arnold*, 727 F.Supp.3d 821, 825 (D. Minn. 2024) ("In Minnesota, a statute is generally severable").  Subdivision 5(b) can be severed so long as the valid and void portions of the statute are not so interconnected that the legislature would not have enacted the statute in its severed form.  *Id.*  That is the case here.  If this Court severs Subdivision 5(b), then no individual will be able to ask a Court to preemptively stop speech that might violate the statute, but all post-speech remedies will remain in effect.  There is no evidence that the legislature would have chosen not to enact Section 211B.075 had this subdivision been removed.  That provision stands separate from the post-speech enforcement mechanism described in the rest of the statute and can easily be severed.

**CONCLUSION**

For the foregoing reasons, this Court should affirm the District Court's Order granting County Attorney Johnson's Motion for Judgment on the Pleadings.

Respectfully submitted,

BRAD JOHNSON
ANOKA COUNTY ATTORNEY

Dated:  February 3, 2025        By: */s/Jason J. Stover*
_____
Jason J. Stover (#30573X)
jason.stover@anokacounty.gov
Anoka County Attorney's Office
2100 Third Avenue
Anoka, Minnesota  55303
Phone:  (763) 324-5450
Assistant Anoka County Attorney

*Attorneys for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,905 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2016 in Century Schoolbook font, 14-point.

3. The brief and addendum have been scanned for viruses and are virus free.

BRAD JOHNSON
ANOKA COUNTY ATTORNEY


Dated:  February 3, 2025         By: */s/Jason J. Stover*
                                     _____
                                     Jason J. Stover (#30573X)
                                     jason.stover@anokacounty.gov
                                     Anoka County Attorney's Office
                                     2100 Third Avenue
                                     Anoka, Minnesota  55303
                                     Phone:  (763) 324-5450
                                     Assistant Anoka County Attorney

                                     *Attorneys for Defendants-Appellees*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system on February 3, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

BRAD JOHNSON
ANOKA COUNTY ATTORNEY

Dated:  February 3, 2025     By: */s/ Jason J. Stover*

Jason J. Stover (#30573X)
jason.stover@anokacounty.gov
Anoka County Attorney's Office
2100 Third Avenue
Anoka, Minnesota  55303
Phone:  (763) 324-5450
Assistant Anoka County Attorney

*Attorneys for Defendants-Appellees*