No. 24-3094

# *In the* United States Court of Appeals *for the* Eighth Circuit

Minnesota Voters Alliance, et al.,

Plaintiffs – Appellants,

v.

Keith Ellison, in his official capacity as Attorney General, et al.,

Defendants – Appellees,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Case No. 23-cv-02774 (NEB), Hon. Nancy E. Brasel

## *AMICUS CURIAE* BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA IN SUPPORT OF DEFENDANT-APPELLEES AND AFFIRMANCE


Craig S. Coleman (0325491)
Hannah M. Leiendecker (0399361)
Erica Abshez Moran (0400606)
Kacie Phillips Tawfic (0399980)
Paige K. Haller (0403828)
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center, 90 S. Seventh St.
Minneapolis, MN 55402
Telephone: (612) 766-700
Facsimile: (612) 766-1600
craig.coleman@faegredrinker.com
hannah.leiendecker@faegredrinker.com
erica.moran@faegredrinker.com
kacie.tawfic@faegredrinker.com
paige.haller@faegredrinker.com

Teresa J. Nelson (MN #0269736)
David P. McKinney (MN #0392361)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
2828 University Avenue Southeast
Suite 160
Minneapolis, MN 55414
Phone: 651.645.4097
tnelson@aclu-mn.org
dmckinney@aclu-mn.org

*Counsel for Amicus*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eighth Circuit Local Rule 26.1A, the undersigned counsel for amicus curiae respectfully submit the American Civil Liberties Union of Minnesota ("ACLU-MN") is a 501(c)(3) nonprofit organization. ACLU-MN has no parent corporation, and no publicly held corporation owns ten percent or more of its stock because it has no stock. ACLU-MN does not have a financial interest in the outcome of this litigation.



Appellate Case: 24-3094 Page: 2 Date Filed: 03/07/2025 Entry ID: 5493413

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION AND STATEMENT OF AMICUS CURIAE ........ 1

FACTUAL BACKGROUND ........ 3

I. HISTORY OF FELONY DISENFRANCHISEMENT IN MINNESOTA ........ 3

A. History of Felony Disenfranchisement Law in Minnesota. ........ 3

B. Widely Publicized Prosecutions of Disenfranchised Voters. ........ 4

C. Changes to Minnesota's Felony Disenfranchisement Law. ........ 6

II. PASSING OF MINNESOTA STATUTES SECTION 211B.075 ........ 7

III. THE PRESENT LAWSUIT ........ 7

IV. ACLU HAS A LONG HISTORY OF DEFENDING FREEDOM OF SPEECH AND THE RIGHT TO VOTE. ........ 8

ARGUMENT ........ 9

I. THE PLAINTIFFS-APPELLANTS' LAWSUIT FAILS AS AN AS-APPLIED CHALLENGE. ........ 9

A. The Plaintiffs-Appellants' Complaint Should Be Construed as an As-Applied Challenge. ........ 10

B. Plaintiffs-Appellants' Complaint Fails as an As-Applied Challenge. ........ 11

1. Section 211B.075 within the context of this lawsuit satisfies a compelling state interest. ........ 13

2. Section 211B.075 within this context is narrowly tailored to the compelling state interest. ........ 14

II. RE-ENFRANCHISED VOTERS NEED PROTECTION FROM TARGETED ATTACKS AGAINST THEM. ........ 19

A. Re-Enfranchised Voters May Be Hesitant to Engage in the Voting Process Due to History of Confusion Around and Aggressive Prosecution Tactics for Voting. ........ 20

B. Participation from Re-Enfranchised Voters Is Critical to Working towards Racial Equity. ........ 24

C. Felony Disenfranchisement Has Community-Wide, Generational Effects. ........ 26

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) .......... 9

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) .......... 13

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 18

*Burson v. Freeman*,
504 U.S. 191 (1992) .......... 12, 13, 14, 15, 16

*Final Exit Network, Inc. v. Ellison*,
370 F. Supp. 3d 995 (D. Minn. 2019) .......... 10

*Indep.-All. Party of Minnesota v. Simon*,
87 F.4th 872 (8th Cir. 2023) .......... 11

*McIntrye v. Ohio Election Comm'n*,
514 U.S. 344 (1995) .......... 18, 19

*Minnesota Voters All. v. Mansky*,
138 S.Ct. 1876 (2018) .......... 16, 17, 18

*Nat'l Coal. on Black Civic Participation v. Wohl*,
661 F. Supp. 3d 78 (S.D.N.Y. 2023) .......... 16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 12, 14

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar*,
381 F.3d 785 (8th Cir. 2004) .......... 10, 11

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) .......... 18

*United States v. Alvarez*,
567 U.S. 709 (2012) .......... 12

*Wesberry v. Sanders*,
376 U.S. 1 (1964) .......... 1

**State Cases**

*In re Emilio Andres Trevino et al.*,
No. A23-1570 (Minn. App. Nov. 2, 2023) .......... 22

*Minnesota Voters All. v. Hunt*,
10 N.W.3d 163 (Minn. 2024) .......... 2, 6, 7

*Minnesota Voters All. v. Simon*,
885 N.W.2d 660 (Minn. 2016) .......... 6

*Schroeder v. Simon*,
985 N.W. 2d 529 (Minn. 2023) .......... 2, 4, 6, 8, 24

*State ex rel. Public Disclosure Comm'n v. 199 Vote No! Committee*,
957 P.2d 691 (Wash. 1998) .......... 19

*State of Minnesota v. April Sky Weyaus*,
No. 48-CR-22-1823 (Minn. Dist. Ct. Mille Lacs County Oct. 13, 2023) .......... 22

*State of Minnesota v. April Sky Weyaus*,
No. A23-1565 (Minn. App. Nov. 2, 2023) .......... 22

**State Statutes**

2023 Minn. Laws, Chapter 12 .......... 1, 2, 6

2023 Minn. Laws, Chapter 34, Article 2, § 2 .......... 7

Minn. Stat. § 201.014, subd. 3 .......... 4

Minn. Stat. § 201.275(a) .......... 4

Minn. Stat. § 211B.075 .......... *passim*

Minn. Stat. § 609.165, subd.1 .......... 1, 6

**Rules**

Fed. R. App. P. 29(a)(2) .......... 2



Appellate Case: 24-3094 Page: 5 Date Filed: 03/07/2025 Entry ID: 5493413

Fed. R. App. P. 29(e) ........................................................................................................ 3

**Constitutional Provisions**

Minn. Const. art. VII, § 1 ........................................................................................ 3, 4

**Other Authorities**

Anthony C. Thompson, *Unlocking Democracy: Examining the Collateral Consequences of Mass Incarceration on Black Political Power*, 54 How. L.J. 587, 607 (2011) ................................................................................................ 26

Brian Bakst, MPR News, *A new Minnesota law restores voting rights to thousands of felony offenders* (Aug. 25, 2023), *available at* https://www.npr.org/2023/08/25/1195858238/a-new-minnesota-law-restores-voting-rights-to-thousands-of-felony-offenders#:~:text=BAKST%3A%20They%27ll%20get%20a,estimated%20to%20affect%2055%2C000%20people ........................................................ 23

Christopher Uggen and Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 205 (2004) ................................................................................................ 27

Christopher Uggen et al., *Locked Out 2022: Estimates of People Denied Voting Rights Due to a Felony Conviction* (2022), *available at* https://www.sentencingproject.org/app/uploads/2024/03/Locked-Out-2022-Estimates-of-People-Denied-Voting.pdf........................................5, 21, 24

Dan McGrath, Minnesota Majority, *Felon Voter Fraud Convictions Stemming from Minnesota's 2008 General Election* (Oct. 13, 2011), *available at* https://static.heritage.org/2020/Voter%20Fraud%20Database/Minnesota/Troy%20Alan%20Scott%202011%20MN.pdf..................................5, 20, 21

Erika Wood and Rachel Bloom, ACLU and Brennan Center for Justice, *De Facto Disenfranchisement* (2008), *available at* https://www.aclu.org/documents/de-facto-disenfranchisement........................... 20

Erika Wood, Brennan Center for Justice, *Restoring the Right to Vote* (2009), *available at* https://www.brennancenter.org/sites/default/files/2019-08/Report_Restoring-the-Right-to-Vote.pdf .................................................... 25, 26

Erin Kelley, Brennan Center For Justice, *Racism & Felony Disenfranchisement: An Intertwined History* (May 2017, *available at* https://www.brennancenter.org/our-work/research-reports/racism-felony-disenfranchisement-intertwined-history) ........................................................ 25

First Interim Report and Initial Recommendation of Task Force on Election Integrity (Jan. 30, 2012), *available at* https://www.lrl.mn.gov/docs/2012/other/120134.pdf ......................................... 21

House Elections Finance and Policy Committee, *available at* https://www.house.mn.gov/hjvid/93/896058............................................................ 1

Kristen M. Budd, Ph. D., Sentencing Project, *Increasing Public Safety by Restoring Voting Rights* (2023), *available at* https://www.sentencingproject.org/policy-brief/increasing-public-safety-by-restoring-voting-rights ......................................................................... 27

Kristen M. Budd, Ph.D et al., The Sentencing Project, *Minnesota Should Restore Voting Rights to Over 55,000 Citizens* (2023), *available at* https://www.sentencingproject.org/app/uploads/2023/01/Minnesota-Voting-Rights-for-People-with-Felony-Convictions.pdf ................................ 24, 27

Mark Haase, *Civil Death in Modern Times: Reconsidering Felony Disenfranchisement in Minnesota*, 99 Minn. L. Rev. 1913, 1919-20 (2015)..........................................................................................*passim*

Mark Kumleben et al., *Electoral Confusion: Contending with Structural Disinformation in Communities of Color* (June 2022), *available at* https://protectdemocracy.org/wp-content/uploads/2022/06/electoral-confusion-contending-with-structural-disinformation-in-communities-of-color.pdf ........................................... 23

## INTRODUCTION AND STATEMENT OF AMICUS CURIAE

The right to vote is the cornerstone of our constitutional democracy and unequivocally recognized as a foundational and fundamental right. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

In 2023, Minnesota took two legislative steps toward ensuring that the right to vote in this state is safeguarded and protected. It enacted Minn. Stat. § 609.165, subd. 1 (the "Re-Enfranchisement Statute")[1], which extended the franchise to more than 50,000 Minnesotans living in the community following felony conviction.[2] And it also enacted Minn. Stat. § 211B.075, a law designed to preserve access to the ballot box by addressing voter intimidation, interference, and the provision of misinformation around voting qualifications and the time, place, and manner of voting.

Together, these two laws are vitally important in addressing historic felony disenfranchisement and its ripple effects, particularly in communities of color. Felony disenfranchisement in Minnesota has led to "a disproportionately higher percentage

---

[1] The Re-Enfranchisement Statute was included as part of the "Re-Enfranchisement Law." The full law is set forth in 2023 Minn. Laws ch. 12.

[2] January 11, 2023 meeting of the House Elections Finance and Policy Committee, *available at* https://www.house.mn.gov/hjvid/93/896058 at 43:36.



Appellate Case: 24-3094 Page: 8 Date Filed: 03/07/2025 Entry ID: 5493413

of Black and Native American Minnesotans [being] deprived of the right to vote due to a felony conviction than white Minnesotans." *Schroeder v. Simon*, 985 N.W. 2d 529, 553 (Minn. 2023).

On August 7, 2024, the Minnesota Supreme Court rejected the challenge brought by Plaintiffs-Appellants Minnesota Voters Alliance, Mary Amlaw, Ken Wendling, and Tim Kirk against the Re-Enfranchisement Act, 2023 Act of Mar. 3, 2023, ch. 12, 2023 Minn. Laws 64, 64–68. *See Minnesota Voters All. v. Hunt*, 10 N.W.3d 163, 170 (Minn. 2024). The present lawsuit turns it sights on Section 211B.075. Plaintiffs-Appellants argue that because they intend to "continue saying that felons who have not completed their sentences cannot lawfully vote" under their interpretation of the Minnesota Constitution, Section 211B.075 is unconstitutional. (*See* App. 7-8, 31-32; R. Doc. 13, at ¶ 23 and Prayer for Relief.)

Amicus American Civil Liberties Union of Minnesota ("ACLU-MN") submits this amicus brief pursuant to Fed. R. App. P. 29(a)(2). ACLU-MN is a 501(c)(3) nonprofit organization. It is the Minnesota affiliate of the American Civil Liberties Union. Both are private, nonprofit, nonpartisan organizations who together have nearly two million members and supporters dedicated to the principles of liberty and equality embodied in our nation's federal and state constitutions and civil rights laws.

ACLU-MN submits this brief for two reasons. First, it is well-positioned to speak to the compelling need for Section 211B.075 due to its long involvement in felony re-enfranchisement litigation in Minnesota courts, as well as its efforts to

register newly re-enfranchised voters. Second, the ACLU respectfully believes the Court's consideration of Plaintiffs-Appellants' constitutional challenge will benefit from the ACLU's unique perspective obtained from vigorously defending both the right to vote and freedom of speech.[3]

For the reasons set forth in further detail below, the Court should affirm the district court's order dismissing the Plaintiffs-Appellants' complaint.

## FACTUAL BACKGROUND

## I. HISTORY OF FELONY DISENFRANCHISEMENT IN MINNESOTA

### A. History of Felony Disenfranchisement Law in Minnesota.

Felony disenfranchisement in Minnesota dates back to 1857, when Minnesotans drafted and approved Article VII of the State's first Constitution. At that time, Article VII prohibited from voting: "[a] person who has been convicted of treason or felony, unless restored to civil rights"; a "person under guardianship"; or a person who is insane or not mentally competent. Minn. Const. art. VII, § 1. Though Article VII has been amended over time to nearly achieve universal suffrage,[4]

---

[3] No party's counsel authored the brief in whole or in part. No party to party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the ACLU, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. FRAP 29(E).

[4] Minnesota's Constitution was amended to allow Black males to vote in 1867, and further expanded later to provide universal suffrage. *See* Mark Haase, *Civil Death in*

the language of Article VII, Section 1 has been unaltered since ratification of the Constitution.[5]

How voting rights are restored following felony conviction in Minnesota has changed over the years. *See generally Schroeder*, 985 N.W. 2d at 540-43 (describing history of how voting rights were restored to those convicted of a felony between 1857 and 1919).

**B. Widely Publicized Prosecutions of Disenfranchised Voters.**

Minnesota statutes have long provided a framework for the prosecution of ineligible voters. Under Minn. Stat. § 201.014, subd. 3, "[a]ny individual who votes who knowingly is not eligible to vote is guilty of a felony." Minn. Stat. § 201.014, subd. 3 (2023). Ineligible voters can be and have been prosecuted by county attorneys. Indeed, Minnesota Statute Section 201.275(a) provides that a county attorney must ensure that any allegations of illegal voting must be promptly investigated. Minn. Stat. § 201.275(a). If a county attorney refuses or fails to do so, he or she "is guilty of a misdemeanor and upon conviction shall forfeit office." *Id.*

---

*Modern Times: Reconsidering Felony Disenfranchisement in Minnesota*, 99 Minn. L. Rev. 1913, 1919-20 (2015).

[5] There is no record that whether to prohibit felons from voting was debated at the time of the Constitution's adoption (*see Schroeder*, 985 N.W. 2d at 539 and Haase, *supra* note 4, at 1917-18), nor any record that it was considered, justified, explained, or debated during the 1974 process to modernize the Constitution's language or during any of the Article VII amendments.



Appellate Case: 24-3094 Page: 11 Date Filed: 03/07/2025 Entry ID: 5493413

This statutory framework has been used to specifically target voters with felony records, to investigate voting by re-enfranchised voters. Following the 2008 election, Minnesota Majority (a non-profit organization that claims to be an advocate for "electoral reforms") attempted to prove massive voter fraud in the Presidential election.[6] Minnesota Majority reported 2,803 "suspected ineligible felon voters" it believed voted illegally to county attorneys throughout Minnesota.[7] After prosecutors investigated the allegations, 95 percent of the identified individuals were not even charged.[8]

Similarly, in 2016, Minnesota Voters Alliance ("MVA")[9], a plaintiff in this action, filed a petition, alleging that election officials "[were] not taking the necessary

---

6 *See* Christopher Uggen et al., *Locked Out 2022: Estimates of People Denied Voting Rights Due to a Felony Conviction* (2022), at 14, *available at* https://www.sentencingproject.org/app/uploads/2024/03/Locked-Out-2022-Estimates-of-People-Denied-Voting.pdf (last visited Feb. 7, 2025); *see also* Dan McGrath, Minnesota Majority, *Felon Voter Fraud Convictions Stemming from Minnesota's 2008 General Election* (Oct. 13, 2011), *available at* https://static.heritage.org/2020/Voter%20Fraud%20Database/Minnesota/Troy%20Alan%20Scott%202011%20MN.pdf (last visited Feb. 7, 2025) (describing Minnesota Majority's efforts to investigate "whether any felons who were illegally registered managed to actually vote").

7 McGrath, *Felon Voter Fraud*, *supra* note 6, at 2.

8 *See* Uggen, *Locked Out 2022*, *supra* note 6, at 14.

9 MVA describes itself as a "nonpartisan organization which advocates for election integrity and provides research and voter education to Minnesotans." (App. 7-8; R. Doc. 13, at ¶ 23.)



Appellate Case: 24-3094 Page: 12 Date Filed: 03/07/2025 Entry ID: 5493413

steps to ensure that those ineligible to vote [were] not permitted to vote." *See Minnesota Voters All. v. Simon*, 885 N.W.2d 660, 661 (Minn. 2016). Specifically, MVA asserted that "despite receiving information on a continuing basis regarding felons . . . whose right to vote had been revoked or otherwise restricted . . . , Minnesota election officials" failed to take actions to prevent them from voting. *Id.* at 663-64.

### C. Changes to Minnesota's Felony Disenfranchisement Law.

In 2019, individuals who were living in the community under parole or supervisory release brought challenges to Minnesota Statute § 609.165, subd. 1. On February 15, 2023, the Minnesota Supreme Court upheld Minn. Stat. § 609.165, subd. 1. Critically, the Court expressly held that the legislature has broad discretion to determine how civil rights and the right to vote are restored following a felony conviction. *Schroeder*, 985 N.W.2d at 556. Thus, the Minnesota Supreme Court explicitly recognized that the legislature may act to restore the right to vote, and it did just that following the *Schroeder* decision.

On March 3, 2023, Governor Tim Walz signed into law the Re-Enfranchisement Statute, and it became effective July 1, 2023. The Re-Enfranchisement Law also amended Minnesota Statutes 2022, section 201.014 by adding subdivision 2.a., which provided that "[a]n individual who is ineligible to vote because of a felony conviction has the civil right to vote restored during any period when the individual is not incarcerated for the offense." Minn. Laws 2023, ch. 12. Thus, voting rights are restored upon release from incarceration.



Appellate Case: 24-3094 Page: 13 Date Filed: 03/07/2025 Entry ID: 5493413

MVA challenged the legislation in June 2023 in *Minnesota Voters Alliance v. Hunt*. 10 N.W.3d at 166. The Minnesota Supreme Court affirmed dismissal of MVA's lawsuit in a decision issued on August 7, 2024, holding that MVA and individual taxpayers lacked standing to bring their claims. *Id.* at 170.

## II. PASSING OF MINNESOTA STATUTES SECTION 211B.075

In 2023, Minnesota also enacted a new law to promote election integrity and address voter intimidation, interference, and the provision of misinformation relating to the right to vote. *See* Minn. Stat. § 211B.075; 2023 Minn. Laws ch. 34, art. 2, § 2. Section 211B.075 prohibits voter intimidation and deceptive practices, and interference with registration or voting. Minn. Stat. § 211B.075.

## III. THE PRESENT LAWSUIT

In September 2023, Plaintiffs-Appellants MVA, Mary Amlaw, Ken Wendling, and Tim Kirk ("Plaintiffs-Appellants")[10] filed the present action, seeking a declaration that Section 211B.075 is unconstitutional, facially and as-applied, and seeking an injunction against defendants Keith Ellison (as Attorney General) and Brad Johnson (as Anoka County Attorney) enforcing it. (App. 31-32; R. Doc. 13, Prayer for Relief.)

MVA and the individual Plaintiffs-Appellants claim that they "intend to speak, verbally and in writing, in opposition to" the newly enacted Re-Enfranchisement Law,

---

[10] Ms. Amlaw, Mr. Wendling, and Mr. Kirk are "long-time supporters and volunteers with MVA." (App. 8-9; R. Doc. 13, ¶ 25.)



Appellate Case: 24-3094 Page: 14 Date Filed: 03/07/2025 Entry ID: 5493413

by stating "that felons still serving their sentences do not have a right to vote in Minnesota because the Minnesota Constitution preempts the [the recently-passed felon re-enfranchisement law.]" (*Id.* ¶¶ 18, 57.) Plaintiffs-Appellants claim that Section 211B.075 is facially unconstitutional, because it is overbroad (*id.* ¶¶ 99-105), constitutes content-based discrimination (*id.* ¶¶ 108-115), is vague (*id.* ¶¶ 118-132), and amounts to a prior restraint (*id.* ¶¶ 135-142).

In a well-reasoned, thorough opinion, the District of Minnesota dismissed MVA's lawsuit. Importantly, the district court determined that "MVA essentially presents an as-applied challenge cloaked as a facial challenge." (Add. 6.) And the district court specifically concluded that MVA failed to provide any analysis sufficient to substantiate a facial challenge. (*Id.*) The district court went on to conclude that the law the constitutional under either analysis. (*Id.* at 8-11.)

## IV. ACLU HAS A LONG HISTORY OF DEFENDING FREEDOM OF SPEECH AND THE RIGHT TO VOTE.

The ACLU-MN's organizational purpose is to protect the rights and liberties guaranteed to all Minnesotans by the United States and Minnesota Constitutions and laws, including freedom of speech, and the right to vote. For decades, the ACLU-MN has litigated voting rights cases in Minnesota state and federal courts. That includes, from its inception, *Schroeder v. Simon,* 985 N.W.2d 529, a case in which the ACLU-MN represented the plaintiffs challenging Minnesota's prior felony disenfranchisement law, and *Minnesota Voters Alliance v. Hunt,* 10 N.W.3d 163, in which the ACLU-MN



Appellate Case: 24-3094 Page: 15 Date Filed: 03/07/2025 Entry ID: 5493413

was granted intervenor status to defend the new voting restoration law against MVA's constitutional challenge.

The ACLU-MN has developed and implemented an ongoing campaign around the new Re-Enfranchisement Statute. This campaign continues to contact and engage with the 55,000+ newly enfranchised Minnesotans in order to educate this marginalized and previously disenfranchised group about the change in law, how to vote, and the democratic process more generally. The campaign involves developing and activating its members, volunteers, and activists toward greater voter participation. Specific campaign actions include activities like voter registration, phone banking, door knocking, advertising on social media, developing and sending educational mailers, hosting a series of community forums, and leadership development activities, all of which are strategically designed for those who recently had their rights restored.

## ARGUMENT

### I. THE PLAINTIFFS-APPELLANTS' LAWSUIT FAILS AS AN AS-APPLIED CHALLENGE.

The Plaintiffs-Appellants' claims focus solely on how Section 211B.075 unconstitutionally restricts their speech as an organization and not on whether it unconstitutionally restricts speech in "a substantial number of its applications . . . judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Stevens*, 559 U.S. 460



Appellate Case: 24-3094 Page: 16 Date Filed: 03/07/2025 Entry ID: 5493413

(2010)). Even under the First Amendment overbreadth doctrine's more general treatment of facial challenges, Plaintiffs-Appellants' claims present only an as-applied challenge to the statute due to their limited scope. As applied to the specific context that Plaintiffs-Appellants have set forth in their Complaint, their claims fail because Section 211B.075 survives even the strictest level of scrutiny. The Plaintiffs-Appellants' complaint should therefore be dismissed.

### A. The Plaintiffs-Appellants' Complaint Should Be Construed as an As-Applied Challenge.

An as-applied challenge is a "challenge to the statute's application only as-applied to the party before the court." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004). "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Id.* at 790. A facial challenge, in contrast, even in the overbreadth context, targets the constitutionality of the statute in a substantial number of its applications. *Final Exit Network, Inc. v. Ellison*, 370 F. Supp. 3d 995, 1009, 1013 (D. Minn. 2019).

The Plaintiffs-Appellants' complaint focuses on a problem unique to them. They point to no evidence that other parties not before the Court wish to promote false information about voting eligibility. The complaint alleges that Plaintiffs-Appellants "have a good-faith belief—and intend to keep saying—that felons still serving their sentences do not have a right to vote in Minnesota because the Minnesota Constitution preempts [the recently-passed felon re-enfranchisement law]."



Appellate Case: 24-3094 Page: 17 Date Filed: 03/07/2025 Entry ID: 5493413

(App. 6; R. Doc. 13, ¶ 18.) Because of Section 211B.075, the Plaintiffs-Appellants say they "reasonably fear prosecution" for making that speech and "fear 'retaliation' from those convicted of felonies still serving their sentences." (*Id.*) According to the Plaintiffs-Appellants, "[t]heir fears are quite real" because Anoka County Attorney Brad Johnson "filed a counterclaim against the Plaintiffs-Appellants seeking a restraining order against their speech. (*Id.* ¶ 19.) In doing so, the Plaintiffs-Appellants largely ignore the multitude of other applications of Section 211B.075 in the state of Minnesota. This is a classic example of an as-applied challenge. *Klobuchar*, 381 F.3d at 790.

It does not matter that the Plaintiffs-Appellants have labeled their action a facial challenge. (App. 7; R. Doc. at 13, ¶ 22.) The Court must look to the substance of the complaint to determine whether a challenge is facial or as-applied. *See, e.g.*, *Indep.-All. Party of Minnesota v. Simon*, 87 F.4th 872, 875 n.2 (8th Cir. 2023) ("The complaint purported to raise facial and as-applied challenges. However, the district court concluded that, in substance, plaintiffs brought only a facial challenge."). Because the complaint focuses on the legality of Section 211B.075 as applied to them, it must be construed as an as-applied challenge, regardless of the label provided by the Plaintiffs-Appellants.

**B. Plaintiffs-Appellants' Complaint Fails as an As-Applied Challenge.**

Content-based restrictions on speech are "presumptively unconstitutional" and must withstand strict scrutiny to survive, meaning that they "may be justified only if

the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Even when it comes to false statements, the United States Supreme Court has "reject[ed] the notion that false speech should be in a category that is presumptively unprotected." *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (plurality). These principles "comport[] with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718. However, "[s]ome false speech may be prohibited even if analogous true speech could not be," and such situations are most likely to arise where there is "evidence that the speech was used to gain a material advantage." *Id.* at 721, 723; *see also id.* at 736 (Breyer, J., concurring) (recognizing limitations on false speech have been upheld "where specific harm is more likely to occur").

As these principles demonstrate, it is rare for a court to uphold content-based restrictions of speech under a strict scrutiny analysis. In the narrow context of situations "when the First Amendment right threatens to interfere with the act of voting itself," *Burson v. Freeman*, 504 U.S. 191, 209 n.11 (1992), however, a modified strict scrutiny applies where the regulation of speech must be "reasonable" and "not significantly impinge on constitutionally protected rights," *id.* at 209 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986)) (emphasis omitted). Section 211B.075 satisfies this standard to the extent that it prohibits intentionally false or

misleading speech about the time, place, manner, or legal consequences of voting that is uttered for the purpose of disenfranchising voters; such prohibitions survive strict scrutiny under the First Amendment.

### 1. Section 211B.075 within the context of this lawsuit satisfies a compelling state interest.

It is well-established "that a State has a compelling interest in protecting voters from confusion and undue influence" and "in ensuring that an individual's right to vote is not undermined by fraud in the election process." *Burson*, 504 U.S. at 199. The Supreme Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). The Supreme Court has further recognized that the government has "obviously" compelling interests in (1) "protecting the right of its citizens to vote freely for the candidates of their choice," and (2) ensuring that "an election [is] conducted with integrity and reliability." *Burson*, 504 U.S. at 198-99.

As Minnesota's Attorney General has highlighted, the spread of election disinformation is on the rise in Minnesota. (Appellee Keith Ellison Br. at 15 (citing *Hearing Before H. Pub. Safety, Fin., & Pol'y Comm.*, 2023 Leg., 93d Sess. at 1:10:50–:11:12 (Minn. Feb. 21, 2023) (statement of Rep. Walter Hudson)).) For example, legislators heard reports "of groups giving potential voters false information, such as



Appellate Case: 24-3094 Page: 20 Date Filed: 03/07/2025 Entry ID: 5493413

lying about where polling locations were, when people could vote, or who was eligible to vote." (*Id.* at 3 (citing *Hearing Before H. Pub. Safety, Fin., & Pol'y Comm.*, 2023 Leg., 93d Sess. at 1:10:50–:11:12 (Minn. Feb. 21, 2023) (statement of Rep. Walter Hudson)).) Section 211B.075 was passed to address the problem of rising disinformation . (*Id.* at 15.) To the extent that it prohibits intentionally false or misleading speech about the time, place, manner, or legal consequences of voting that is uttered for the purpose of disenfranchising voters, the statute thus furthers the State's compelling interest in protecting "the integrity and reliability of the electoral process." *Burson*, 504 U.S. at 199.

#### 2. Section 211B.075 within this context is narrowly tailored to the compelling state interest.

In addition to furthering a compelling state interest, a statute must be narrowly tailored to that interest to satisfy strict scrutiny. *Reed*, 576 U.S. at 163. When it comes to election laws prohibiting intentional false speech about where, when, or how to vote, or the legal consequences of voting, and made for the purpose of disenfranchising voters, courts do not require States to prove their law is perfectly tailored. *Burson*, 504 U.S. at 210. This is because "it is difficult to isolate the exact effect of these laws on voter intimidation and election fraud." *Id.* at 208. Because such false communications directly "threaten[] to interfere with the act of voting itself," *id.* at 209 n.11, the government need not present empirical evidence showing that regulating them is necessary.

Instead, courts look holistically at the historical need for a regulation on election speech and its reasonableness in light of that need. *Burson* provides a useful example. In *Burson*, the Supreme Court upheld a Tennessee law imposing a 100-foot campaign-free zone around polling place entrances. Under the Tennessee law, no person could solicit votes for or against a candidate, party, or ballot measure, distribute campaign materials, or "display . . . campaign posters, signs or other campaign materials" within the restricted zone. 504 U.S. at 193–94. The plurality concluded that the law withstood even the strict scrutiny applicable to speech restrictions in traditional public forums, albeit in a modified form. *Id.* at 211. The plurality emphasized specific instances of poll workers being used to intimidate and manipulate voters in the state in the past. *See id.* at 200–204. In light of that historical backdrop, the plurality, and Justice Scalia concurring in the judgment, upheld Tennessee's determination, supported by overwhelming consensus among the states and "common sense" that a reasonable and not boundless campaign-free zone outside polls was "necessary" to protect the right to vote. *Id.* at 200, 206–208, 211; *see also id.* at 214-216 (Scalia, J. concurring). The Court rejected any "'litmus-paper test' that will separate valid from invalid restrictions," Id. at 210–11 (quoting *Anderson*, 460 U.S. at 789) and the plurality thought it "sufficient to say that in establishing a 100-foot boundary, Tennessee is on the constitutional side of the line," *id.* at 211.

Section 211B.075, in the context of this lawsuit, is narrowly tailored for similar reasons, or this court should construe it as such. The law was passed in light of

incidents of purposeful, targeted election disinformation aimed at preventing voters from exercising their constitutional right. Like the statute in *Burson*, it is "common sense" that a statute that prevents coercion and the spread of deliberate misinformation about voting logistics and consequences is "necessary" to preserve the integrity of fair and free elections in the state. That is sufficient to prove the statute as applied here is narrowly tailored to protect the State's interest. And courts in other jurisdictions analyzing similar election-integrity laws concerning false statements have concluded that such laws survive strict scrutiny. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 121 n.29 (S.D.N.Y. 2023) (concluding New York law prohibiting voter intimidation would survive a strict scrutiny challenge).

This case is distinguishable from those involving statutes that restrict speech trying to influence how voters vote with respect to a candidate or issue. The Supreme Court discussed this distinction in *Minnesota Voters Alliance v. Mansky*. 138 S.Ct. 1876 (2018), where the Court struck down a Minnesota law prohibiting voters from "wearing a 'political badge, political button, or any other political insignia' inside a polling place on Election Day." *Mansky,* 138 S. Ct. at 1879 (quoting Minn. Stat. § 211B.11(1) (Supp. 2017)). In doing so, the Court reaffirmed the compelling state interests underlying electioneering regulations as articulated in *Burson*—the prevention of "fraud, voter intimidation, confusion, and general disorder." *Id.* at 1886. And it emphasized the physical process of "[c]asting a vote is a weighty civic act," entitling



Appellate Case: 24-3094 Page: 23 Date Filed: 03/07/2025 Entry ID: 5493413

voters to "an island of calm" to "peacefully contemplate their choices." *Id.* at 1887 (citation omitted).

The *Mansky* Court ultimately held, however, that Minnesota's statute drew an "[un]reasonable line" restricting voters' freedom of speech. *Id.* at 1888. Under *Burson*'s "strict scrutiny [framework] applicable to speech restrictions in traditional public forums," *id.* at 1886, the Court concluded Minnesota's apparel ban—with its "unmoored use of the term 'political'" and "haphazard interpretations. . . in official guidance," *id.* at 1888—failed to "support[] its good intentions," *id.* at 1892.

The Court went on to draw a distinction between the apparel ban and a statute that simply prohibited misinformation. Minnesota sought to employ the ban on "political" apparel to prohibit voters from, among other things, wearing buttons stating, "Please I.D. Me." *Id.* at 1889. Rejecting Minnesota's argument that this particular button should be banned because it was misleading as Minnesota does not require voters to show identification when voting, the Court explained that Minnesota's ban reached all "political" buttons, not merely buttons that were misleading. *Id.* The Court clarified, however, that the outcome would have been different if Minnesota had only sought to ban apparel containing false or misleading speech about voting requirements intended to deceive voters, stating unequivocally, "***We do not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures.***" *Id.* at 1889 n.4 (emphasis added).



Appellate Case: 24-3094 Page: 24 Date Filed: 03/07/2025 Entry ID: 5493413

*Mansky* thus makes clear that a law banning speech intended to mislead voters about voting requirements and procedures may be narrowly tailored and survive strict scrutiny. To the extent that Section 211B.075 prohibits people from transmitting false or misleading statements about the logistics and consequences of voting with the intent to prevent someone from voting, this law is exactly the kind of law contemplated by the *Mansky* Court in clarifying that "the State may prohibit messages intended to mislead voters about voting requirements and procedures." *Id.*.

Conversely, if 211B.075 were interpreted more broadly to regulate "core" political speech, such as exchanges of views about candidate positions or political debate, *McIntrye v. Ohio Election Comm'n*, 514 U.S. 344, 346 (1995), it would not survive strict scrutiny, *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (holding Ohio law prohibiting false speech about political candidates to be unconstitutional). "The First Amendment affords the broadest protection to [core] political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). True speech about how, when, and where to vote, and the legal consequences of voting, does not threaten the integrity and reliability of the vote. And when it comes to core political speech, even much false speech must still be protected. *Susan B Anthony List*, 814 F3d at 474–76. "Urgent, important, and effective [political] speech can be no less protected than impotent speech, lest the right to speak be relegated to

those instances when it is least needed." *McIntyre*, 514 U.S. at 347; *see State ex rel. Public Disclosure Comm'n v. 199 Vote No! Committee*, 957 P.2d 691, 698-99 (Wash. 1998) (en banc.) (noting attempts to insulate voters from false core political speech is "patronizing and paternalistic" and "assumes the people of this state are too ignorant or disinterested to investigate, learn, and determine for themselves the truth or falsity in political debate").

In sum, the Court should hold Section 211B.075 constitutional as-applied to the Plaintiffs-Appellants in this case to the extent that is narrowly tailored to protect a compelling state interest in protecting the integrity of fair and free elections by prohibiting intentionally false or misleading speech about the time, place, manner, or legal consequences of voting that is uttered for the purpose of disenfranchising voters and therefore survives even strict scrutiny.

## II. RE-ENFRANCHISED VOTERS NEED PROTECTION FROM TARGETED ATTACKS AGAINST THEM.

Section 211B.075 as applied here plays an especially important role in ensuring that re-enfranchised Minnesotans, all of whom are a highly vulnerable to allegations of criminal and unconstitutional conduct given their past and current relationship to the state, actually exercise their newly restored right to vote. As discussed below, engaging Re-Enfranchised Voters is especially critical to address systemic racial disparity in voting that dilutes the power and voice of communities of color. The present-day disinformation campaign harkens back to the ugly and horrific Jim Crow era when

there were widespread, blatant efforts to mislead and intimidate voters of color. Section 211B.075 helps protect against some of the causes of *de facto* disenfranchisement of eligible, Re-Enfranchised Voters, such as misinformation.[11]

### A. Re-Enfranchised Voters May Be Hesitant to Engage in the Voting Process Due to History of Confusion Around and Aggressive Prosecution Tactics for Voting.

Section 211B.075 protects vulnerable Re-Enfranchised Voters by prohibiting individuals and groups like MVA and its members from circulating disinformation (for instance, claiming Re-Enfranchised Voters will be illegally voting in the upcoming election). Re-Enfranchised Voters may already fear prosecution for attempting to vote, given the history of investigation and prosecution of voters with felony records in the past. As discussed above, on more than one occasion, so-called "election integrity" organizations (including MVA) have provided lists of potentially ineligible voters to government and/or election officials to investigate potential illegal voting.[12]

---

[11] For further discussion of the causes and effects of *de facto* disenfranchisement, see Erika Wood and Rachel Bloom, ACLU and Brennan Center for Justice, *De Facto Disenfranchisement* (2008), *available at* https://www.aclu.org/documents/de-facto-disenfranchisement (last visited Feb. 7, 2025). The article notes that persistent confusion among election officials, complex registration procedures, and the dissemination of inaccurate and misleading information leads to "the *de facto* disenfranchisement of untold hundreds of thousands of *eligible* would-be voters throughout the country," and that this has "devastating long-term effects in communities across the country." Wood & Bloom, *De Facto Disenfranchisement*, at 1 (emphasis in original).

[12] *See, e.g.*, McGrath, *Felon Voter Fraud*, *supra* note 6, at 2.

For example, in 2008 alone, at the behest of an such an organization, at least 2,803 individuals suffered through largely baseless criminal investigations for potential illegal voting.[13] And over a period of nearly two decades (2000-2019), a total of fewer than 377 Minnesotans have been convicted of voting while ineligible or registering while ineligible.[14]

The risk of investigation alone might reasonably cause fear for a Re-Enfranchised Voter, but that fear is compounded by existing confusion over eligibility and the recent changes in the law. Before the 2023 passage of the Re-Enfranchisement Statute, some disenfranchisement occurred due to confusion and misinformation about eligibility, including from government officials themselves. In 2011, then-Governor Mark Dayton established the Minnesota Task Force on Election Integrity, which found that "current Minnesota law frustrates the ability of all citizens to clearly understand eligibility rules and frustrates election officials and county prosecutors in the administration of those rules."[15] As one concrete example of such

---

13 *Id.*

14 *See* Uggen, *Locked Out 2022*, *supra* note 6, at 14.

15 *See* First Interim Report and Initial Recommendation of Task Force on Election Integrity (Jan. 30, 2012), *available at* https://www.lrl.mn.gov/docs/2012/other/120134.pdf (last visited Feb. 7, 2025).



Appellate Case: 24-3094 Page: 28 Date Filed: 03/07/2025 Entry ID: 5493413

confusion, in the 2012 election, an eligible voter with a stayed felony conviction was prevented from voting because of information given to her by her probation officer.[16]

More recently, in October 2023 (after the Re-Enfranchisement Statute was enacted), a Court in Mille Lacs County issued a number of sentencing hearing orders that declared that the Re-Enfranchisement Statute was unconstitutional and sowed further confusion for Re-Enfranchised Voters.[17] Specifically, the Court explicitly instructed certain specific individuals convicted of a felony that they were "prohibited by the constitution of the State of Minnesota from registering to vote, or voting, or attempting to register to vote, or attempting to vote . . . until [those individuals] serve[d] the sentence and complete[d] supervised release, or complete[d] probation, and [their] civil rights [were] restored." The Court of Appeals thereafter entered a writ of prohibition, ruling that "the district court had no authority to declare a statute unconstitutional, sua sponte, in a supplemental sentencing order."[18]

---

16 *See* Haase, *Civil Death*, *supra* note 4, at 1928-29 (noting that "[i]t was not until th[is] case was taken to the Minnesota Supreme Court that clarification was provided that she and thousands of other Minnesotans in her situation (individuals who had received a felony stay of adjudication) in fact can legally vote")

17 *See, e.g.*, Order Holding Minn. Stat. § 201.014, Subd. 2A (2023) Unconstitutional, *State of Minnesota v. April Sky Weyaus*, File No. 48-CR-22-1823. (R. Doc. 49-3.).

18 Special Term Order (Nov. 2, 2023), *In re April Sky Weyaus et al.* and *In re Emilio Andres Trevino et al.*, #A23-1565 and #A23-1570. (R. Doc. 49-4.)

In sum, significant confusion exists relating to re-enfranchised voting, and confusion over eligibility can cause Re-Enfranchised Voters to fear further involvement with the justice system.[19] If individuals are permitted to make or distribute pre-election statements to the effect that "felons on supervised release, probation, or work release do not have the right to vote in Minnesota under the Minnesota Constitution" (App. 17-18; R. Doc. 13, ¶ 58), this confusion will be compounded even further. Moreover, this will be layered on top of electoral disinformation that continues to be directed to communities of color across the United States. For instance, researchers have found that marginalized communities "have historically been among the targets of pernicious online influence campaigns" that contain digital disinformation (as well as "deceptive mailers and misleading campaign advertising in print news and on TV, radio, and even billboards").[20] The

---

[19] *See* Brian Bakst, MPR News, *A new Minnesota law restores voting rights to thousands of felony offenders* (Aug. 25, 2023), *available at* https://www.npr.org/2023/08/25/1195858238/a-new-minnesota-law-restores-voting-rights-to-thousands-of-felony-offenders#:~:text=BAKST%3A%20They%27ll%20get%20a,estimated%20to%20affect%2055%2C000%20people (last visited Feb. 7, 2025) (consultant working on re-enfranchisement efforts noting that standards for voting that differ by state "feed confusion about eligibility" and "[t]hat can make people hesitant to vote out of fear they'll get tangled up again in the justice system").

[20] *See* Mark Kumleben et al., *Electoral Confusion: Contending with Structural Disinformation in Communities of Color* (June 2022) at 10, 12, *available at* https://protectdemocracy.org/wp-content/uploads/2022/06/electoral-confusion-contending-with-structural-disinformation-in-communities-of-color.pdf (last visited Feb. 7, 2025).

internet is a powerful tool that is only the latest frontier in a long history of voter suppression aimed at communities of color in this country.

In short, Section 211B.075 adds a crucial additional layer of protection for Re-Enfranchised Voters, who already face fear and confusion regarding their ability to vote, without additional intimidation, misinformation, or interference.

### B. Participation from Re-Enfranchised Voters Is Critical to Working towards Racial Equity.

"A disproportionately higher percentage of Black and Native American Minnesotans are deprived of the right to vote due to a felony conviction than white Minnesotans[.]" *Schroeder*, 985 N.W.2d at 553; *see also* Kristen M. Budd, Ph.D et al., The Sentencing Project, *Minnesota Should Restore Voting Rights to Over 55,000 Citizens* (2023)[21] (noting that "Black Minnesotans [are] disenfranchised at over four times the state rate" and "Latinx Minnesotans are disenfranchised at nearly twice the state rate")[22]. Consequently, the number of Re-Enfranchised Voters are also disproportionately people of color.

This is the result of persistent racial discrimination and disparate impacts of the criminal justice system over time. After the Civil War and the expansion of suffrage to

---

[21] *Available at* https://www.sentencingproject.org/app/uploads/2023/01/Minnesota-Voting-Rights-for-People-with-Felony-Convictions.pdf (last visited Feb. 7, 2025).

[22] *Citing* Uggen, *Locked Out 2022*, *supra* note 6.



Appellate Case: 24-3094 Page: 31 Date Filed: 03/07/2025 Entry ID: 5493413

Black men, felony disenfranchisement laws were weaponized to disenfranchise this new voting population. *See generally* Erin Kelley, Brennan Center For Justice, *Racism & Felony Disenfranchisement: An Intertwined History* (May 2017) (describing the imposition "of a slew of criminal laws designed to target black citizens[,]" and the enactment of "broad disenfranchisement laws that revoked voting rights from anyone convicted of any felony," rather than "a few select crimes")[23]; Haase, *Civil Death*, *supra* note 4, at 1919-22, 1927. Of course, racist enforcement and sentencing has further calcified mass disenfranchisement of people of color.[24]

As discussed further below, the mass disenfranchisement of people of color has the effect of suppressing their political power, both now and in the future. Research indicates that disenfranchisement "affect[s] voter turnout in neighborhoods with high incarceration rates, even among people who are eligible to vote." Erika

---

[23] *Available at* https://www.brennancenter.org/our-work/research-reports/racism-felony-disenfranchisement-intertwined-history (last visited Feb. 7, 2025).

[24] *See* Kelley, *Racism & Felony Disenfranchisement*, *supra* note 23, at 2 (describing examples of application of certain laws exclusive against African American voters); *see also* Budd, *Minnesota Should Restore Voting*, *supra* note 21, at 2 (noting that "racial disparities are driven, at least in part, by biased sentencing," and citing sociological journal finding that "differences in Minnesotans' race, skin color, and Afrocentric features influence their likelihood of being sentenced to prison, as opposed to being placed on probation or having their charge adjusted to a misdemeanor").



Appellate Case: 24-3094 Page: 32 Date Filed: 03/07/2025 Entry ID: 5493413

Wood, Brennan Center for Justice, *Restoring the Right to Vote* (2009)[25] at 12; *see also* Anthony C. Thompson, *Unlocking Democracy: Examining the Collateral Consequences of Mass Incarceration on Black Political Power*, 54 How. L.J. 587, 607 (2011) (finding that "the probability of voting declines for African-Americans, even if they do not possess a criminal record" in states that impose "restrictive criminal disenfranchisement laws"). When a disproportionate number of a minority community is disenfranchised, it decimates the political power of that community, and consequently "all residents of these communities, not just those with convictions, become less influential than residents of more affluent communities from which fewer people are sent to prison." Wood, *Restoring the Right to Vote*, at 12-13.

### C. Felony Disenfranchisement Has Community-Wide, Generational Effects.

As just discussed, continued disenfranchisement of Re-Enfranchised Voters has community-wide, generational effects that go far beyond any individual's ability to vote, particularly in communities of color. Research supports that children who are raised by parents who engage in the voting process are more likely to vote as adults or

[25] *Available at* https://www.brennancenter.org/sites/default/files/2019-08/Report_Restoring-the-Right-to-Vote.pdf (last visited Feb. 7, 2025).

otherwise be civically engaged.[26] Thus, the disenfranchisement of a parent can discourage an entire family from civic participation.

Likewise, the feeling of marginalization engendered by mass disenfranchisement can "undermine perceptions of system legitimacy," adversely impacting public safety.[27] One study from 2004 looked at recidivism as it related to voting: among individuals who had been previously arrested, 27% of non-voters were re-arrested, while only 12% of voters were re-arrested.[28]

On the other side of the coin, research indicates that engagement with the democratic process is important for individuals and their broader communities. The right to vote and act of voting leads to a decreased feeling of being an "outsider" and is associated with reduced involvement in crime.[29]

---

[26] *See* Haase*, Civil Death*, *supra* note 4, at 1927-28; Wood, *Restoring the Right to Vote*, *supra* note 25, at 12 (noting that one study found that a "parent's political participation had the greatest effect on [a] child's initial decision to vote").

[27] Haase*, Civil Death*, *supra* note 4, at 1927-28

[28] Christopher Uggen and Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 205 (2004).

[29] *See* Budd, *Minnesota Should Restore Voting*, *supra* note 21, at 2 (quotation omitted); Kristen M. Budd, Ph.D, The Sentencing Project, *Increasing Public Safety by Restoring Voting Rights* (2023), *available at* https://www.sentencingproject.org/policy-brief/increasing-public-safety-by-restoring-voting-rights/ (last visited Feb. 7, 2025) (noting that "Minnesotans with a criminal history were significantly less likely to be re-arrested if they voted in the 1996 presidential election"); Wood, *Restoring the Right to Vote*, *supra* note 25, at 11 (noting that "a member of the National Black Police Association testified that rights restoration 'promotes the successful reintegration of

## CONCLUSION

For the reasons set out above, the Court should affirm the district court's order dismissing Plaintiffs-Appellants' complaint.

formerly incarcerated people, preventing further crime and making our neighborhoods safer'").



Appellate Case: 24-3094 Page: 35 Date Filed: 03/07/2025 Entry ID: 5493413

Dated: February 10, 2025

Revised Brief: March 7, 2025

Respectfully submitted,

*/s/ Craig S. Coleman*
Craig S. Coleman (0325491)
Hannah M. Leiendecker (0399361)
Erica Abshez Moran (0400606)
Kacie Phillips Tawfic (0399980)
Paige K. Haller (0403828)
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center, 90 S. Seventh St.
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
craig.coleman@faegredrinker.com
hannah.leiendecker@faegredrinker.com
erica.moran@faegredrinker.com
kacie.tawfic@faegredrinker.com
paige.haller@faegredrinker.com

***-AND-***

Teresa J. Nelson (MN #0269736)
David P. McKinney (MN #0392361)
**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**
2828 University Avenue Southeast
Suite 160
Minneapolis, MN 55414
Phone: 651.645.4097
tnelson@aclu-mn.org
dmckinney@aclu-mn.org

*Counsel for Amicus*



Appellate Case: 24-3094 Page: 36 Date Filed: 03/07/2025 Entry ID: 5493413

**CERTIFICATE OF COMPLIANCE**
**WITH FED. R. APP. P. 29 AND 32 AND 8TH CIR. R. 28(A)(H)(2)**

1. This document complies with the type-volume limit of Fed. R. App. P 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,492 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond font.

3. The brief has been scanned for viruses and the brief is virus free.

*/s/ Craig S. Coleman*
CRAIG S. COLEMAN



Appellate Case: 24-3094 Page: 37 Date Filed: 03/07/2025 Entry ID: 5493413

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I caused to be filed the Amicus Curiae Brief of the American Civil Liberties Union of Minnesota with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Pursuant to direction from the Clerk of Court, the Revised Amicus Curiae Brief was filed and served on March 7, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Craig S. Coleman*
CRAIG S. COLEMAN



Appellate Case: 24-3094 Page: 38 Date Filed: 03/07/2025 Entry ID: 5493413