# United States Court of Appeals
## For the Eighth Circuit

No. 24-3094


Minnesota Voters Alliance; Mary Amlaw; Ken Wendling; Tim Kirk

*Plaintiffs - Appellants*

v.

Keith M. Ellison, in his official capacity as Attorney General; Brad Johnson, in his official capacity as Anoka County Attorney

*Defendants - Appellees*

------------------------------

American Civil Liberties Union of Minnesota

*Amicus on Behalf of Appellee(s)*

Appeal from United States District Court
for the District of Minnesota


Submitted: October 21, 2025
Filed: August 20, 2026


Before GRUENDER, STRAS, and KOBES, Circuit Judges.

STRAS, Circuit Judge.

A group of Minnesotans want to express their belief that certain felons cannot vote. Can the state criminalize their speech? In denying a preliminary injunction, the district court thought so. We disagree.

I.

Minnesota has a law that allows felons to vote unless they are currently behind bars. *See* Minn. Stat. § 201.014. Minnesota Voters Alliance, a group focused on election integrity, challenged the law in state court. Its view is that the Minnesota Constitution allows felons to vote only if their "civil rights" have been "restored," which occurs at the end of their sentence. Minn. Const. art. VII, § 1. For some, it comes with their release from prison. For others, like those on supervised release, it does not. *See* Minn. Stat. § 243.05, subd. 1(b) (explaining that parolees "remain[] in the legal custody and under the control of the commissioner" of corrections). The Alliance thinks anyone who is still under the supervision of the Department of Corrections is ineligible to vote because their civil rights remain limited. *See* Minn. Const. art. VII, § 1; *see also* Minn. Stat. § 243.05, subd. 1(c) (declaring that "state parole and probation agent[s]" can arrest them without a "warrant" under certain circumstances). Unable to challenge the law in state court, *see Minn. Voters All. v. Hunt*, 10 N.W.3d 163, 170 (Minn. 2024) (holding that its members lacked standing), the group wants to keep speaking publicly on the issue.

Standing in the way is another Minnesota law aimed at preventing the spread of election disinformation. It states, in relevant part, that:

> (a) No person may, within 60 days of an election, cause information to be transmitted by any means that the person:
>
> (1) intends to impede or prevent another person from exercising the right to vote; and
>
> (2) knows to be materially false.



Appellate Case: 24-3094 Page: 2 Date Filed: 08/20/2026 Entry ID: 5674075

> (b) The prohibition in this subdivision includes but is not limited to information regarding the time, place, or manner of holding an election; *the qualifications for or restrictions on voter eligibility at an election*; and threats to physical safety associated with casting a ballot.

Minn. Stat. § 211B.075, subd. 2 (emphasis added). Also prohibited are voter "[i]ntimidation" and "[i]nterference with registration or voting." *Id.* § 211B.075, subds. 1, 3.

Enforcement takes several forms. One is criminal liability, which allows state or county prosecutors to pursue gross-misdemeanor charges against violators. *See id.* § 211B.075, subd. 5(a). A second is a civil action, brought by those same officials, "to prevent or restrain a violation . . . if there is a reasonable basis to believe" someone intends to violate the statute. *Id.* § 211B.075, subd. 5(b). Anyone "injured by" a suspected violation can bring one too. *Id.* No matter who files it, violations give rise to "damages, together with costs of investigation[,] . . . reasonable attorney fees," and up to a $1,000 "civil penalty." *Id.* § 211B.075, subd. 5(c).

The Alliance is worried that it already has a target on its back. The group's director has repeatedly written on whether felons can vote. And members plan to continue their education and advocacy efforts for as long as they can. To head off government enforcement efforts, the Alliance brought its own preemptive lawsuit against Attorney General Keith Ellison and Anoka County Attorney Brad Johnson in federal district court.[1] It seeks a declaratory judgment and injunctive relief against the law, which it believes violates the First Amendment. A counterclaim filed by Anoka County alleges that it is already too late: it seeks money damages and injunctive relief "restraining" the Alliance from violating the law. In response, the group amended its own complaint to allege that the counterclaim is itself evidence of a well-founded fear of prosecution.

---

[1]When we refer to the "Alliance," we include the two individual appellants, Mary Amlaw and Tim Kirk.



Appellate Case: 24-3094 Page: 3 Date Filed: 08/20/2026 Entry ID: 5674075

Unpersuaded by the Alliance's constitutional arguments, the district court dismissed the complaint and denied a preliminary injunction. With the counterclaim still pending, however, the case is not yet final, meaning we can only review the decision to deny a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1) (authorizing appeals from orders "refusing . . . injunctions"); *Kropp v. Ziebarth*, 557 F.2d 142, 143 n.1 (8th Cir. 1977) (explaining that "[s]ince the counterclaim is still pending, the District Court's order . . . is not a final order").

## II.

Before we do, however, we first need to decide whether the Alliance has standing to challenge the law. At this early stage, "we assume the allegations in the complaint are true and view them in the light most favorable to [the organization]." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019).

Standing has three requirements: "(1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) a likelihood of redressability." *Hershey v. Jasinski*, 86 F.4th 1224, 1229 (8th Cir. 2023). The traceability and redressability requirements pose no problem for the Alliance, given that Minnesota's law stands as a barrier to its speech. *See Telescope Media Grp.*, 936 F.3d at 749. The disagreement is about whether it has suffered an injury in fact.

To qualify, any harm must be "actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). The Alliance has one of each. The time and money involved in defending against the counterclaim are actual injuries.[2] *See Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 690, 693 (8th Cir. 2017) (explaining that "defending against [a] . . . suit" is a sufficient injury). It also faces

---

[2]We cannot ignore the amended complaint. *See In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000) (explaining that the resolution of "questions of subject matter jurisdiction" depends on "the face of the amended complaint"). The adequacy of the injury now rests on what it alleges.



Appellate Case: 24-3094 Page: 4 Date Filed: 08/20/2026 Entry ID: 5674075

imminent injury from the possibility that a court will "prevent or restrain" it from speaking or require it to pay money damages. Minn. Stat. § 211B.075, subd. 5(b); *see id.* § 211B.075, subd. 5(c); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). It makes no difference that Anoka County's counterclaim appears to be on hold for the time being. Nothing prevents it from changing its mind again, particularly as the rest of the case moves forward. *Cf. FBI v. Fikre*, 601 U.S. 234, 241 (2024) ("To show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to [its] old ways." (alteration in original) (citation omitted)).

We commonly see two types of injuries under the First Amendment. One occurs when a law restricts speech "affected with a constitutional interest" and "a credible threat of prosecution" exists. *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (citation omitted). Closely related is the second, "self-censor[ship]," when speakers "would like to engage in arguably protected speech, but [are] chilled from doing so by the existence of the statute." *Id.* (citation omitted). We have described these requirements as "lenient" and "forgiving," *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699–700 (8th Cir. 2021), because a "general expression of intent [can be] enough," *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020). Especially at the preliminary-injunction stage, when allegations are what matter. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (distinguishing between facial and factual attacks on jurisdiction); *Jones*, 947 F.3d at 1103 (focusing on just the allegations in an appeal from a preliminary-injunction ruling).

Although members of the Alliance have not gone as far as self-censoring, they describe their "trepidation" about speaking. And the counterclaim on its own, even if not a prosecution, is enough to credibly threaten its constitutional interest. *See Jones*, 947 F.3d at 1104; *cf. Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (explaining that "fear[s] of prosecution [are not] objectively unreasonable" when enforcement efforts have already occurred). It reflects a view among some government officials that the statute covers the Alliance's speech. Add the fact that



Appellate Case: 24-3094 Page: 5 Date Filed: 08/20/2026 Entry ID: 5674075

Minnesota itself has argued throughout this litigation that the First Amendment does not protect what the Alliance has *already* said, and a prosecution could be just around the corner. *See Chiles v. Salazar*, 607 U.S. 627, 638 n.* (2026) (concluding there was standing when the state had "fought" the "suit through three courts over three years" and "expressly declined to disavow enforcement"); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (explaining that one relevant factor is whether "the State has not disavowed any intention of invoking the criminal penalty provision"). Both actual and imminent, the Alliance's First Amendment injuries give it standing.

III.

Standing is only the first step for the Alliance. Getting a preliminary injunction requires consideration of four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C. L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "In balancing the equities[,] no single factor is determinative." *Id*.

Although we review the ultimate decision to deny a preliminary injunction for an abuse of discretion, the legal merits of the claim—including the likelihood of success—are subject to de novo review. *See Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). Faced with a "limited record" and "arguments that may not be fully developed," it requires "an educated guess about the outcome of the case." *Rodgers*, 942 F.3d at 466 (Stras, J., concurring in part and dissenting in part); *see Benson Hotel Corp. v. Woods*, 168 F.2d 694, 697 (8th Cir. 1948) ("The decision of the trial court on granting the motion for preliminary injunction will not estop either of the parties on the trial of the case on its merits . . . .").



Appellate Case: 24-3094 Page: 6 Date Filed: 08/20/2026 Entry ID: 5674075

A.

The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits laws "abridging the Freedom of speech." U.S. Const. amend. I; *see Wagner v. Jones*, 664 F.3d 259, 269 (8th Cir. 2011) ("The First Amendment is binding on the states through the Fourteenth Amendment."). "It promotes the free exchange of ideas by allowing people to speak in many forms and convey a variety of messages, including those that 'invite dispute' and are 'provocative and challenging.'" *Telescope Media Grp.*, 936 F.3d at 750 (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)).

Here, the "dispute[d]" message is that felons are ineligible to vote, which in Minnesota's view is not only "provocative and challenging," but criminal. *Id.* (quoting *Terminiello*, 337 U.S. at 4). If the First Amendment protects the Alliance's speech and Minnesota's law regulates its content, then strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). If either condition is absent, however, the standard is more forgiving. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (explaining that "[c]ontent-neutral laws . . . are subject to an intermediate level of scrutiny" (citation omitted)); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387–89 (1992) (explaining that "proscribable speech" is less protected than "fully protected speech").

1.

There is no doubt this case involves speech. Between the opinion pieces written by the Alliance's director and public statements by the organization, they are trying to persuade Minnesotans that felons cannot vote if they have yet to complete their sentences. *See* Minn. Const. art. VII, § 1. The First Amendment protects speech on a matter of public concern, like these statements, whether they are correct or not. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995) (explaining that the First Amendment applies to efforts to advocate for an idea by



Appellate Case: 24-3094 Page: 7 Date Filed: 08/20/2026 Entry ID: 5674075

distributing “handbills”); *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (recognizing that publishing “editorials” is protected by the First Amendment).

In fact, speech of this type is at the “core of the First Amendment.” *Republican Party of Minn. v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (en banc). Political speech of all kinds, but particularly about the government, is essential to assuring the “unfettered interchange of ideas.” *Roth v. United States*, 354 U.S. 476, 484 (1957); *see State v. Crawley*, 819 N.W.2d 94, 121 (Minn. 2012) (Stras, J., dissenting) (highlighting “the indisputable principle that criticism of the government—and those who run it—is at the core of the First Amendment”). Regardless of whether the government agrees with it.

Unsurprisingly, Minnesota and Anoka County believe the Alliance’s speech falls within one of the “historically unprotected categories” they are free to regulate. *United States v. Stevens*, 559 U.S. 460, 470 (2010). The distinction they draw is a fine one: the First Amendment protects speech about “who *should be*” able to vote, not speech about “who *is* eligible to vote.” (Emphases added). The former qualifies as speech designed to generate “political and social change.” *Roth*, 354 U.S. at 484. The latter, however, is the “[s]preading [of] false information in and of itself,” *Herbert v. Lando*, 441 U.S. 153, 171 (1979), because the law is knowable and certain.

The Supreme Court rejected a similar argument in *United States v. Alvarez*, 567 U.S. 709 (2012). There, the question was whether the First Amendment protected someone who falsely claimed to have won the Congressional Medal of Honor, which was a crime under the Stolen Valor Act. *See id.* at 713–17 (plurality opinion). It too was knowable and certain—the speaker either did or did not receive the award—but the Court rejected the idea that the speech was unprotected. *See id.* at 722 (plurality opinion); *id.* at 732–33 (Breyer, J., concurring in the judgment). In the plurality’s words, “some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.” *Id.* at 718 (plurality opinion).



Appellate Case: 24-3094 Page: 8 Date Filed: 08/20/2026 Entry ID: 5674075

Minnesota's law cuts off the "open and vigorous expression of views" by criminalizing statements about who can vote, even if, as the Alliance believes, there is room to disagree about it. *Id.* Like the law in *Alvarez*, it bans a "false statement made at any time" and "in any place," perhaps even those made by the Alliance in its brief in this case. *Id.* at 722. And the difficulty is in pinpointing exactly where factual speech ends and opinion begins. After all, "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).

Consider the problem here. On one side, the Alliance relies on a provision of the Minnesota Constitution, an objective *fact*, to support its *opinion* that felons still serving their sentences cannot vote. On the other, Minnesota and Anoka County point to a statute, another objective *fact*, to support their *opinion* that felons can vote once they leave prison, whether they are on supervised release or not. The government cannot endorse one view and criminalize the other without implicating the First Amendment. *See R.A.V.*, 505 U.S. at 392 (explaining that the government cannot "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules").

*Minnesota Voters Alliance v. Mansky* is not to the contrary. 585 U.S. 1 (2018). To be sure, it left no "doubt that the State *may* prohibit messages intended to mislead voters about voting requirements and procedures." *Id.* at 18 n.4 (emphasis added). But to say the government *may* do something does not mean it *always can*. And *Mansky* did not say that misleading speech about elections receives no First Amendment protection. Nor could it, given what the Court said about false speech just a few years earlier in *Alvarez*. 567 U.S. at 722 (plurality opinion) (rejecting "the notion that false speech" is "presumptively unprotected"); *id.* at 733 (Breyer, J., concurring in the judgment) (explaining that false statements receive some First Amendment "protection[s]"). *Mansky*'s footnote just makes clear that a state *can ban* intentionally misleading messages about "voting requirements and procedures" when doing so *is consistent* with the First Amendment. *Mansky*, 585 U.S. at 18 n.4.



Appellate Case: 24-3094 Page: 9 Date Filed: 08/20/2026 Entry ID: 5674075

Curbing unprotected speech, like fraud, is one situation. *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he government's power to protect people against fraud has always been recognized in this country and is firmly established[.]" (citation omitted)). But Minnesota's statute does not work like a fraud statute because, like the one in *Alvarez*, it targets mere knowing misstatements. *See* Minn. Stat. § 211B.075, subd. 2 (requiring that the speaker "intends to impede or prevent another person from exercising the right to vote," not that they succeed in doing so). There is no requirement that someone listening acts upon it to their detriment. *See id.*; *cf. U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011) (requiring that the fraudulent "representation caused action in reliance thereon"); *Madigan*, 538 U.S. at 620 (explaining that the fraud exception applied to telemarketers who had obtained millions in donations through statements that were made "with the intent to mislead the listener, and succeeded in doing so"). Reliance, the element that is missing in Minnesota's statute, is what creates the speech-related harm that leaves fraud unprotected. *See Alvarez*, 567 U.S. at 719 (plurality opinion) (discussing how "defamation" or "fraud" are types of "legally cognizable harm[s] associated with . . . false statement[s]"); *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021) (focusing on the "harm" speech causes).

Other "*legally cognizable* harm[s]" will do too. *Alvarez*, 567 U.S. at 719 (plurality opinion) (emphasis added); *see Animal Legal Def. Fund*, 8 F.4th at 786 (concluding "that intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment"). *Animal Legal Defense Fund*, for example, involved a law that prohibited "access[ing] . . . an agricultural production facility by false pretenses." *Id.* at 785 (citation omitted). We relied on the "ancient cause of action" of "[t]respass" to conclude that the false speech received no First Amendment protection. *Id.* at 786. Using that case as a guide, Minnesota and Anoka County argue that the Alliance's speech is unprotected because it leads to the "legally cognizable harm" of preventing voters from casting their ballots. *Id.*

Not every harm, however, leaves speech unprotected. If the rule were otherwise, then *Alvarez* itself would have come out differently. The Supreme Court, after all, had no doubt that "false representations have the tendency to dilute the value and meaning of military awards." *Alvarez*, 567 U.S. at 726 (plurality opinion); *see id.* at 737 (Breyer, J., concurring in the judgment) ("To permit those who have not earned those honors to claim otherwise dilutes the value of the awards."). Misleading voters can inflict serious harm too. But unlike fraud, defamation, and trespass, there is no "historic and traditional categor[y]" of unprotected speech covering false statements about voting. *Free Speech Coal.*, 606 U.S. at 471 (citation omitted); *cf. Taylor v. Beckham*, 178 U.S. 548, 577 (1900) ("Our system of elections was unknown to the common law, and the whole subject is regulated by constitutions and statutes passed thereunder.").

In recent years, the Supreme Court has refused to expand the categories of unprotected speech to include "depictions of animal cruelty," *Stevens*, 559 U.S. at 468–69, violent video games, *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792–93 (2011), and most relevant here, non-fraudulent, non-defamatory false statements, *see Alvarez*, 567 U.S. at 722 (plurality opinion); *id.* at 731–33 (Breyer, J., concurring in the judgment). Just like those categories, there is no "long . . . tradition of proscription" of false statements connected to voting. *Brown*, 564 U.S. at 792; *see Stevens*, 559 U.S. at 468–72 (discussing the exclusivity of historically based exceptions). Minnesota and Anoka County may think the Alliance's speech "is not worth it," but the First Amendment disagrees.[3] *Stevens*, 559 U.S. at 470.

2.

Protected, however, does not mean untouchable. It just means the government has a higher burden to justify its regulation, the specifics of which determine the

[3]Nor is anything the Alliance said a "true threat." *Virginia v. Black*, 538 U.S. 343, 360 (2003). At no point did it "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359.



Appellate Case: 24-3094 Page: 11 Date Filed: 08/20/2026 Entry ID: 5674075

level of scrutiny it receives. *See, e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 68 n.3 (2022) (explaining that courts must decide "which level of scrutiny applies" by looking at how the law regulates speech). When the government tries to regulate protected speech because of its content, strict scrutiny applies. *See Reed*, 576 U.S. at 163. "[R]egulations that are unrelated to . . . content," on the other hand, "are subject to an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

Speech regulations come in all forms. Some are explicit in their targeting of certain "subject matter[s]." *Reed*, 576 U.S. at 163 (explaining how some laws "defin[e] regulated speech by particular subject matter"). Others use content-neutral language to disguise a content-based law. *See id.* (discussing "subtle" laws that "regulate[] speech by its function or purpose"). The rule is simple enough to state: strict scrutiny "applies to" regulations based on "the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 69 (quoting *Reed*, 576 U.S. at 163); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976) (concluding that a law regulated content when it "single[d] out speech of a particular content"). In practice, however, it is harder to apply. *See City of Austin*, 596 U.S. at 69.

Fortunately, Minnesota made no attempt to hide the ball. Its "target[]," *id.* (quoting *Reed*, 576 U.S. at 163), is a narrow sliver of speech that "impede[s] or prevent[s] another person from exercising the right to vote," Minn. Stat. § 211B.075, subd. 2(a)(1). Only by considering the specific words spoken can a listener figure out whether the statute applies. *See Vidal v. Elster*, 602 U.S. 286, 294 (2024) ("[A] restriction on speech is content based if the 'law applies to particular speech because of the topic discussed or the idea or message expressed.'" (quoting *Reed*, 576 U.S. at 163)). The *words themselves* must "impede or prevent another person" from voting. Minn. Stat. § 211B.075, subd. 2(a)(1); *see Reed*, 576 U.S. at 164 (concluding that a law regulated based on content when it treated "signs inviting people to attend . . . worship services . . . differently from signs conveying other types of



Appellate Case: 24-3094 Page: 12 Date Filed: 08/20/2026 Entry ID: 5674075

ideas"). Only then, based on the ideas expressed and the speaker's intent, can the government step in.

Undeterred by the law's content-based focus, Anoka County believes intermediate scrutiny applies. For support, it relies on Justice Breyer's concurrence in *Alvarez*. 567 U.S. at 730–32 (Breyer, J., concurring in the judgment) (weighing "the seriousness of the speech-related harm the provision will likely cause, the nature and importance of the provision's countervailing objectives, the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so" in determining what standard to apply). As the "position taken by those Members who concurred in the judgment[] on the narrowest ground[]," it thinks the concurrence is controlling. *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).

We have rejected this theory before, and we do so again. *Animal Legal Defense Fund* explained that, because no single opinion from *Alvarez* was a "logical subset" of the other, neither the plurality opinion nor the concurrence was binding on its own. 8 F.4th at 785. What we can confidently say, however, is that any regulation of "false political speech" is subject to "strict scrutiny," regardless of whether the various opinions in *Alvarez* overlap elsewhere. *281 Care Comm. v. Arneson*, 766 F.3d 774, 783–84 (8th Cir. 2014). The reason, of course, is that it "occupies the core of the protection afforded by the First Amendment."[4] *Id.* at 784.

[4]For that reason, even if Justice Breyer's concurrence controlled, strict scrutiny would still apply. *See Alvarez*, 567 U.S. at 731–32 (Breyer, J., concurring in the judgment). *281 Care Committee* all but recognized as much. 766 F.3d at 784 (discussing how, under Justice Breyer's view, "almost no amount of fine tailoring could achieve a similar government interest in a political context").



Appellate Case: 24-3094 Page: 13 Date Filed: 08/20/2026 Entry ID: 5674075

3.

Strict scrutiny is a "demanding standard." *Brown*, 564 U.S. at 799. As applied here, it requires Minnesota and Anoka County to prove that the statute is "narrowly tailored to serve [a] compelling state interest[]." *Reed*, 576 U.S. at 163. "[P]rotecting voters from confusion and undue influence" may well be a compelling governmental interest. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). But here, Minnesota has not adopted a narrowly tailored approach. *See R.A.V.*, 505 U.S. at 395–96; *see also 281 Care Comm.*, 766 F.3d at 787 (explaining that "the state does not have carte blanche to regulate the dissemination of false statements during political campaigns"). It both "regulates . . . too little and too much." *Miller v. Ziegler*, 109 F.4th 1045, 1052 (8th Cir. 2024) ("A narrowly tailored regulation must be the *least-restrictive* alternative, not too under- or over-inclusive." (emphasis added)).

It overreaches because at least one speech-promoting alternative exists: counter speech. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (explaining that a law was overinclusive because the state had "more benign and narrowly tailored options"). Typically, "[t]he remedy for speech that is false is speech that is true." *Alvarez*, 567 U.S. at 727 (plurality opinion). Especially on political issues, where "counter[ ]speech is the tried[-]and[-]true buffer and elixir." *281 Care Comm.*, 766 F.3d at 793 (highlighting "criminal sanctions" or endless litigation before an administrative agency as "wholly overbroad and overburdensome" options). "[P]lac[ing] potential criminal sanctions" in the way of protected speech, by contrast, is one of the least tailored ways of advancing a government interest, because it has the broadest chilling effect. *Id.* (labeling criminal penalties "overbroad and overburdensome").

Nor is it "necessary" to advance Minnesota's interest. *Id.* at 789. On the contrary, it has uniquely within its possession the names and contact information of every felon on supervision. *See* Minn. Stat. § 243.05, subds. 3, 6. Rather than limiting what others say, it could have launched an education campaign consisting



Appellate Case: 24-3094 Page: 14 Date Filed: 08/20/2026 Entry ID: 5674075

of calls, texts, or emails informing them of their rights. *See 281 Care Comm.*, 766 F.3d at 793 (remarking that counter speech is likely at its "most effective" in the political context); *cf. Alvarez*, 567 U.S. at 729 (plurality opinion) (suggesting that the government could create an online database listing the recipients of military awards to counter stolen-valor claims). Or correction and probation officers could have provided the information in regular "communication[s]." Minn. Stat. § 243.05, subd. 3. Indeed, if anything, counter speech would be a more effective "buffer and elixir" here than in the typical case, because the government knows exactly who it needs to reach and has ready ways to do it. *See, e.g.*, *281 Care Comm.*, 766 F.3d at 778 (considering a law that criminalized knowingly false speech designed to "promote or defeat a ballot question" (citation omitted)).

Overinclusiveness can also come from overenforcement. *See id.* at 790–92. Here, "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations," which means those who oppose the Alliance's message could sue to "inflict[] political damage" on the organization. *Id.* at 790 (quoting *Susan B. Anthony List*, 573 U.S. at 164). Although the party bringing the counterclaim here is a government actor, nothing prevents "*any person* injured by an act prohibited by [the law]" from bringing a separate civil action to "prevent or restrain" the Alliance's speech and collect money damages. Minn. Stat. § 211B.075, subd. 5(b) (emphasis added); *see id.* § 211B.075, subd. 5(c). It makes organizations like the Alliance "easy targets" of abusive lawsuits. *281 Care Comm.*, 766 F.3d at 790 (quoting *Susan B. Anthony List*, 573 U.S. at 164).

In other respects, Minnesota's law does too little. Other types of speech also undermine election integrity. *See, e.g.*, *Brown*, 564 U.S. at 801–02 (concluding that a statute was underinclusive because it regulated violent video games but left other forms of violent media untouched). "[I]mped[ing] or prevent[ing]" eligible voters from casting their ballots is one problem. Minn. Stat. § 211B.075, subd. 2(a)(1). Another is encouraging participation by ineligible voters, including minors and non-citizens. *See* Minn. Const. art. VII, § 1 (requiring eligible voters to be "18 years of age" and a "citizen of the United States"). Both undermine election integrity, but

Minnesota has criminalized one but not the other. A law that allows the Alliance to run an advertisement saying that 16-year-olds *can* vote, but not one saying that felons *cannot*, "undercut[s] significantly [the] defense of the [statute]." *Boos v. Barry*, 485 U.S. 312, 329 (1988); *see 281 Care Comm.*, 766 F.3d at 795 (explaining how treating newspaper advertisements and editorials with the same false content differently would "not advance [the] stated interest"). If Minnesota's election-integrity interest "is compelling enough to justify abridging core constitutional rights," it must "enact regulations that substantially protect that interest from similarly significant threats." *White*, 416 F.3d at 750 (emphasis omitted). And here, it has not.

Strict scrutiny requires more than a loosely tailored law that stifles one side of a debate. Minnesota both goes too far and not far enough in advancing its interest. On remand, it is up to the district court to decide "in the first instance" whether the prohibitions on intimidation and interference will suffer the same fate. *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 780 (8th Cir. 2019) (citation omitted); *see* Minn. Stat. § 211B.075, subds. 1, 3.

B.

The law also allows preemptive lawsuits "to *prevent* or *restrain* a violation . . . if there is a reasonable basis to believe that an individual or entity is committing or intends to commit a prohibited act." Minn. Stat. § 211B.075, subd. 5(b) (emphases added). The Alliance's position is that it authorizes "censorship, a so-called prior restraint on speech." *Hershey*, 86 F.4th at 1233; *see Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320–21 (2002) (describing prior restraints); *see also* 4 William Blackstone, Commentaries *151 (distinguishing between "*previous* restraints upon publications" and "censure for criminal matter when published"). If so, it comes "bearing a heavy presumption against its constitutional validity." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (citation omitted).



Appellate Case: 24-3094 Page: 16 Date Filed: 08/20/2026 Entry ID: 5674075

Once again, the statute does not hide what it does. It allows a court to "prevent or restrain a violation" after "[t]he attorney general, a county attorney, or any person injured" files a civil action. Minn. Stat. § 211B.075, subd. 5(b). Those key words, "prevent or restrain," mean to "keep" something "from happening" or "prevent (a person or group) from doing something or acting in a certain way." *The American Heritage Dictionary of the English Language* 1397, 1497 (5th ed. 2016) (providing definitions of "prevent" and "restrain"). Getting an order of this kind requires a "reasonable basis to believe that an individual or entity . . . intends to commit a prohibited act." Minn. Stat. § 211B.075, subd. 5(b). It authorizes not just a "restrain[t]," but a "prior restraint": a "judicial order[] forbidding certain communications . . . issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (citation omitted).

As prior restraints go, this one has several problematic features. One is the "reasonable[-]basis" standard for granting one. Minn. Stat. § 211B.075, subd. 5(b). The statute does not tell us what a "reasonable basis" entails, but in other contexts the answer is not much. *See Peterson v. W. Nat'l Mut. Ins. Co.*, 946 N.W.2d 903, 910 (Minn. 2020) (explaining that the inquiry is about how a "reasonable insurer would have" acted); *State v. Varnado*, 582 N.W.2d 886, 890 (Minn. 1998) (equating a "reasonable basis" with the relatively lenient standard needed to frisk a suspect). Under it, courts become censors, with little to constrain them other than an educated guess—a "reasonable basis to believe"—that a violation will occur. Minn. Stat. § 211B.075, subd. 5(b); *see Se. Promotions, Ltd.*, 420 U.S. at 559 ("It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable."); *see also Vance v. Universal Amusement Co.*, 445 U.S. 308, 317 (1980) (per curiam) (seeing no constitutional difference between an "administrative censor" and a "state trial judge" imposing a prior restraint).

Missing are procedural safeguards. *See Se. Promotions, Ltd.*, 420 U.S. at 559 (explaining that a "prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system" (citation omitted)). Nothing prevents a government official from getting an injunction and then sitting back until the election is over and the speech no longer matters. *See* Minn. Stat. § 211B.075, subd. 5(b); *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965). After all, the fuse under the statute is particularly short: it covers speech made "within 60 days of an election," which is a short enough time frame that any preliminary determination supporting a prior restraint effectively becomes final. Minn. Stat. § 211B.075, subd. 2(a); *see 281 Care Comm.*, 766 F.3d at 790 (showing particular concern about lawsuits filed right before an election); *Freedman*, 380 U.S. at 59 (requiring a prior restraint to "be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution").

Making matters worse is that any order "prevent[ing] or restrain[ing]" speech, Minn. Stat. § 211B.075, subd. 5(b), can be of "indefinite duration," *Vance*, 445 U.S. at 316. "Presumably, [speakers] would be required to obey such an order pending review of [the] merits and would be subject to contempt proceedings" if they decide to speak, *id.*, even if the message does not "impede or prevent another person from" voting, Minn. Stat. § 211B.075, subd. 2(a)(1). A prior restraint like that one, as *Vance* tells us, is "more onerous and more objectionable than the threat of criminal sanctions after" a speaker has committed a violation. 445 U.S. at 316. It is a prior restraint of the worst kind.

The point is that, to the extent the statute authorizes a prior restraint on speech, the First Amendment stands in the way. We express no opinion, however, about the constitutionality of any other available remedy. *See* Minn. Stat. § 211B.075, subd. 5(a)–(d); *see also id.* § 645.20 (explaining that, "[u]nless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable"); *Back v. State*, 902 N.W.2d 23, 31 (Minn. 2017) (discussing how Minnesota courts should "sever as little as possible of an unconstitutional law").

C.

A few loose ends remain. One is a facial overbreadth challenge to Minn. Stat. § 211B.075, subd. 2. We need not address it, however, because we have already concluded it cannot be constitutionally applied. *See Jacobsen v. Howard*, 109 F.3d 1268, 1274 (8th Cir. 1997) (declining to address a facial overbreadth challenge after "hold[ing] the statutes [we]re unconstitutional as applied"). To the extent the Alliance believes that other provisions are overbroad, it has waived those arguments. *See United States v. Wearing*, 837 F.3d 905, 911 n.6 (8th Cir. 2016) (per curiam) (explaining that arguments "not sufficiently developed in [the] opening brief" are waived); Fed. R. App. P. 28(a)(8)(A) (stating that the brief must "cit[e] . . . the authorities . . . on which the appellant relies"); *see also* Minn. Stat. § 211B.075, subds. 1, 3 (covering "intimidation" and "interference" with voting).

The other is a void-for-vagueness theory. Unlike the overbreadth challenge, which focuses on just the "transmi[ssion]" of election disinformation, this one attacks the entire statute. Minn. Stat. § 211B.075, subd. 2(a); *see Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019) (en banc) (addressing a lobbyist's facial vagueness challenge after saying the law as applied to him was unconstitutional). In the Alliance's view, words like "threaten," "damage," "harm," "loss," "impede," and "interfere" are too vague to provide "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Although the law does not define or otherwise explain what these words mean, they are "not vague." *Calzone*, 942 F.3d at 426. Rather, in the absence of a statutory definition, we apply their common and ordinary meanings, "taking into account the context in which [they] are used." *Id.*; *see DRB No. 24, LLC v. City of Minneapolis*, 774 F.3d 1185, 1188 (8th Cir. 2014). Even the most abstract terms, like "impede" and "interfere," have straightforward definitions that "a person of ordinary intelligence" can understand. *Calzone*, 942 F.3d at 426 (citation omitted); *see American Heritage Dictionary*, *supra*, at 881 (defining "impede" as to "retard or

obstruct the progress of"); *id.* at 914 (defining "interfere" as to "be or create a hindrance or obstacle").

The statute may present challenging applications, but many do. Just because some situations may raise more difficult interpretive questions than others does not mean the statute is ambiguous, much less unconstitutionally vague. *See United States v. Harriss*, 347 U.S. 612, 618 (1954) ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise.").

IV.

We accordingly affirm in part, reverse in part, and remand for the entry of a preliminary injunction in favor of the Alliance and its members. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2026); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc).

______________________________



Appellate Case: 24-3094 Page: 20 Date Filed: 08/20/2026 Entry ID: 5674075