**No. 24-3094**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

---

MINNESOTA VOTERS ALLIANCE; MARY AMLAW; KEN WENDLING; TIM KIRK,

*Plaintiffs-Appellants*,

v.

KEITH ELLISON, *in his official capacity as Attorney General for the State of Minnesota*; BRAD JOHNSON, *in his official capacity as Anoka County Attorney*,

*Defendants-Appellees*.

---

On Appeal from the U.S. District Court for the District of Minnesota
Honorable Nancy E. Brasel
Civil Action No. 0:23-CV-02774

---

**BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND PROTECT DEMOCRACY UNITED IN SUPPORT OF PETITION FOR EN BANC AND PANEL REHEARING**

---

Cameron Kistler
PROTECT DEMOCRACY UNITED
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
(202) 579-4582
cameron.kistler@protectdemocracy.org

Anna Baldwin
Rachel Appel
David Kronig
Ellen Boettcher
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW, Ste. 300
Washington, DC 20036
(202) 736-2200
abaldwin@campaignlegalcenter.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Campaign Legal Center states that it is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

In addition, *amicus curiae* Protect Democracy United is a 501(c)(4) nonprofit. Protect Democracy United has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.



Appellate Case: 24-3094 Page: 2 Date Filed: 09/25/2026 Entry ID: 5687885

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................... i

TABLE OF AUTHORITIES .......................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ................................................................................................ 4

I. False speech designed to cause a legally cognizable harm, like deprivation of the right to vote, is not constitutionally protected. ............. 4

A. Deprivation of the right to vote is a long-recognized legally cognizable harm. ....................................................................... 5

B. The Deceptive Practices Provision does not merely target false statements. ........................................................................... 8

II. Minnesota's Deceptive Practices Provision survives even strict scrutiny analysis because it is narrowly tailored. .................................................... 9

CONCLUSION .............................................................................................. 11

CERTIFICATE OF COMPLIANCE ................................................................... 13

CERTIFICATE OF SERVICE ........................................................................... 14



Appellate Case: 24-3094 Page: 3 Date Filed: 09/25/2026 Entry ID: 5687885

## TABLE OF AUTHORITIES

**Cases** **Pages**

*281 Care Committee v. Arneson*, 766 F.3d 774 (8th Cir. 2014)....11

*Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781 (8th Cir. 2021) ("*ALDF*") .... 2-5, 7, 9

*Ashby v. White*, 92 Eng. Rep. 126 (1703)....2, 5

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011)....7

*Burson v. Freeman*, 504 U.S. 191 (1992)....9

*Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989) ....9

*Ex parte Yarbrough*, 110 U.S. 651 (1884)....9

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)....10

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018)....9

*Nixon v. Herndon*, 273 U.S. 536 (1927)....2, 6

*Taylor v. Howe*, 225 F.3d 993 (8th Cir. 2000)....6

*United States v. Alvarez*, 567 U.S. 709 (2012)....4, 7, 8, 10

*United States v. Stevens*, 559 U.S. 460 (2010)....7

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021)....2, 3, 5, 8

*Wayne v. Venable*, 260 F. 64 (8th Cir. 1919)....6

*Webb v. Portland Manufacturing Co.*, 29 F. Cas. 506 (C.C.D. Me. 1838)....5

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)....11

**Rules**

Fed. R. App. P. 29(a)(4)(E) .......... 1

**Statutes**

18 U.S.C. § 912 .......... 8

18 U.S.C. § 1001 .......... 8

18 U.S.C. § 1621 .......... 8

Minn. Stat. § 201.014, subdiv. 3 .......... 10

Minn. Stat. § 201.054, subdiv. 2 .......... 10

Minn. Stat. § 211B.075, subdiv. 2(a) .......... 9

Minn. Stat. § 211B.075, subdiv. 5(b) .......... 11

**Other Authorities**

Erika Wood & Rachel Bloom, ACLU and Brennan Center for Justice, De Facto Disenfranchisement (Oct. 1, 2008), https://www.aclu.org/documents/de-facto-disenfranchisement. .......... 11

Press Release, *Torts: Miscellaneous Provisions Is Approved*, Am. L. Inst. (May 19, 2025), https://www.ali.org/news/articles/torts-miscellaneous-provisions-approved .......... 3

Restatement (First) of Torts § 865 (1939) .......... 3, 6

Restatement (Second) of Torts § 865 (1979) .......... 3, 6

Restatement (Third) of Torts: Misc. Provisions § Misc.8 (Am. L. Inst., Tentative Draft No. 4, 2025) .......... 3

Restatement (Third) of Torts: Miscellaneous Provisions § Misc.8 cmt. b (2025). ...6

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization that has worked for more than 20 years to advance democracy through law. CLC engages in litigation, policy development, and advocacy to protect voting rights and ensure broad and equal access to the ballot.

Protect Democracy United is a 501(c)(4) nonprofit organization that testified in favor of Minn. Stat. § 211B.075 before the Minnesota Legislature.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* state that no party's counsel or person except *amici* and their counsel authored this brief or contributed funds towards its preparation or submission.



Appellate Case: 24-3094 Page: 6 Date Filed: 09/25/2026 Entry ID: 5687885

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court has held that Iowa may punish a lie told to gain entry to a hog barn, because "intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment" and trespass causes such legally cognizable harm. *Animal Legal Def. Fund v. Reynolds*, 8 F.4th 781, 786 (8th Cir. 2021) ("*ALDF*"). Yet the panel held here that Minn. Stat. § 211B.075, subdiv. 2 ("the Deceptive Practices Provision") may not punish a knowing lie told to keep an eligible citizen from the ballot box. It attempted to reconcile the two results by reasoning that unlike the trespass tort in *ALDF*, there was no "historic and traditional category of unprotected speech covering false statements about voting," Aug. 20, 2026 Op. 11 ("Op.") (cleaned up), because "'[o]ur system of elections was unknown to the common law,'" *id.* (quoting *Taylor v. Beckham*, 178 U.S. 548, 577 (1900)). The panel's legal history, however, was incorrect.

Deprivation of the right to vote has been an actionable wrong at common law since *Ashby v. White* was decided in 1703. 92 Eng. Rep. 126. Indeed, the Supreme Court has repeatedly affirmed that the ability to recover in tort for deprivations of voting rights "hardly has been doubted for over two hundred years, since *Ashby v. White*." *Nixon v. Herndon*, 273 U.S. 536, 540 (1927); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 287 (2021) ("denial of the right to vote" imposes legal injury for which "plaintiff could always obtain damages"). Unsurprisingly, every

version of the *Restatement of Torts* has recognized tort liability for consciously wrongful acts that disenfranchise. *See* Restatement (Second) of Torts § 865 (1979); Restatement (First) of Torts § 865 (1939); *see also* Restatement (Third) of Torts: Misc. Provisions § Misc.8 (Am. L. Inst., Tentative Draft No. 4, 2025).[2]

That history should have controlled the inquiry in this case. *ALDF*, citing *Uzuegbunam*, 592 U.S. at 290, recognizes that the First Amendment does not protect intentionally false speech in furtherance of a legally cognizable harm, even where it yields only nominal damages. 8 F.4th at 786 (noting that nominal damages "are not purely symbolic" but "provide redress for an injury") (internal quotations omitted). And *Uzuegbunam*'s authority for that rule—that a violated right is a real injury even when the plaintiff does "not lose a penny by reason of the violation"—traces back to *Ashby v. White*, the common law foundation for the disenfranchisement tort. 592 U.S. at 287 (citation modified). In other words, *ALDF*'s definition of a legally cognizable harm is rooted in the very wrong the panel here held was not one. Thus, the panel's treatment of the Deceptive Practices Provision cannot be squared with *ALDF*. Minnesota's statute proscribes intentionally false speech intended to

[2] The American Law Institute approved Restatement of the Law Third, Torts: Miscellaneous Provisions in May 2025. *See* Press Release, *Torts: Miscellaneous Provisions Is Approved*, Am. L. Inst. (May 19, 2025), https://www.ali.org/news/articles/torts-miscellaneous-provisions-approved.

disenfranchise eligible voters, a legally cognizable harm with a long historical pedigree, comparable to trespass.

Moreover, even if strict scrutiny applies, reconsideration is still warranted because the panel's tailoring analysis does not hold. The Deceptive Practices Provision reaches only knowing, material falsehoods within sixty days of an election intended to prevent someone from voting, a category that the panel itself called a "narrow sliver of speech." Op. 12. Counter speech is no answer to a lie told on election day, and a statute is not loosely drawn because it does not address issues already prohibited by other statutes.

Accordingly, the Court should grant en banc or panel rehearing and uphold the Deceptive Practices Provision.

## ARGUMENT

### I. False speech designed to cause a legally cognizable harm, like deprivation of the right to vote, is not constitutionally protected.

The Deceptive Practices Provision targets unprotected speech because it is aimed at falsities deployed to deprive someone of the right to vote—a harm long recognized at common law. In *ALDF*, this Court upheld the constitutionality of Iowa's law proscribing false statements used to access agricultural facilities. *See* 8 F.4th at 785-86. *ALDF* took instruction from *United States v. Alvarez*, which affirmed that knowingly false speech designed to cause a "legally cognizable harm associated with a false statement" such as an invasion of privacy could be proscribed.



Appellate Case: 24-3094 Page: 9 Date Filed: 09/25/2026 Entry ID: 5687885

567 U.S. 709, 719 (2012) (plurality opinion). As such, this Court held Iowa's law constitutional because "[t]respass is an ancient cause of action that is long recognized in this country" and a "comparable legally cognizable harm" to those cited in *Alvarez*. *ALDF*, 8 F.4th at 786 (citation modified).

Here, the panel attempted to apply *ALDF* but missed that the deprivation of the right to vote, like trespass, is an ancient cause of action that addresses a legally cognizable harm. A knowing falsehood deployed to accomplish that injury is not protected by the First Amendment.

### A. Deprivation of the right to vote is a long-recognized legally cognizable harm.

Deprivation of the right to vote has been recognized at common law since at least *Ashby v. White* in 1703. 92 Eng. Rep. 126. There, Lord Holt explained that denial of the right to vote imposed a legally cognizable injury: "[t]he right of voting . . . is a thing of the highest importance, and so great a privilege," that "it is a great injury to deprive the plaintiff of it." *Id.* at 136; *see also Uzuegbunam*, 592 U.S. at 287 (noting that the House of Lords ultimately "validat[ed] Lord Holt's position").

American courts have long agreed. In 1838, Justice Story, riding circuit, declared that when there is a "violation of the right to vote" it is "incontrovertibly established" that "law gives the remedy." *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 508 (C.C.D. Me. 1838). In 1927, the Supreme Court declared, "[t]hat private damage may be caused by [deprivation of the right to vote] and may be recovered

for in suit at law hardly has been doubted for over two hundred years, since *Ashby v. White*[,] and has been recognized by this Court." *Nixon*, 273 U.S. at 540 (internal citation omitted). And in *Uzuegbunam*, Justice Thomas relied on *Ashby* for the proposition that "whenever a legal right [is] violated" such as "denial of the right to vote," there is an "injury" that "imports a damage." 592 U.S. at 287 (citation modified). This Court has agreed, too. *See Taylor v. Howe*, 225 F.3d 993, 1012 (8th Cir. 2000) (citing *Ashby v. White*, and observing in case where there was a deprivation of the right to vote, "[a]t least nominal damages must be awarded"); *Wayne v. Venable*, 260 F. 64, 66 (8th Cir. 1919) (right to vote "is so valuable that damages are presumed from the wrongful deprivation of it without evidence of actual loss").

Tort law similarly affirms that intentional acts to disenfranchise can cause legally cognizable harm. *See* Restatement (Second) of Torts § 865 (1979); Restatement (First) of Torts § 865 (1939). As the Third Restatement notes, the tort "originated in England and has long been recognized in the United States." Restatement (Third) of Torts: Miscellaneous Provisions § Misc.8 cmt. b (Am. L. Inst., Tentative Draft No. 4, 2025).

Thus, intentional disenfranchisement is a legally cognizable harm with a long historical pedigree—precisely the type of legally cognizable harm that *ALDF* acknowledged could be addressed by valid proscriptions of false speech. Here, too,

the panel's interpretation of *ALDF* erred. The panel analogized the harm of disenfranchisement to the (real but non-actionable) harms of the dilution of military honors, depictions of animal cruelty, or the violence of video games. *See* Op. 11 (citing *Alvarez*, *United States v. Stevens*, 559 U.S. 460 (2010), *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)). None of those harms have an analog in common law tradition, whereas disenfranchisement does. And critically, that tort allowed for nominal damages, recognizing that the deprivation of the right to vote is a harm even absent any other loss. The legal injury justifying those nominal damages is a "legally cognizable harm," *ALDF*, 8 F.4th at 786, sufficient to take knowingly false speech intended to harm outside the protection *Alvarez* otherwise extends.

Thus, the panel's demand for a "historic and traditional category of unprotected speech covering false statements about voting," Op. 11 (citation modified), asked the wrong historical question. There is no tradition of proscribing false statements about agricultural facilities; instead, this Court asked whether the injury the lie accomplished—trespass—had one. *See ALDF*, 8 F.4th at 786. Here, too, consciously wrongful acts intended to disenfranchise have long been recognized to impose an actionable legal injury. Thus, there is no need for a new category; the speech prohibited by the Deceptive Practices Provision is false speech made to accomplish a legally cognizable harm that falls into *Alvarez*'s recognized category of unprotected speech. *See Alvarez*, 567 U.S. at 717-19; *ALDF*, 8 F.4th at 786 (even

though "none of the cited examples" in *Alvarez* "is precisely on point," trespass is sufficiently close to those examples of proscribable speech for the statute at issue in *ALDF* to be upheld).

### B. The Deceptive Practices Provision does not merely target false statements.

The panel further erred in its conclusion that the Minnesota statute targets falsity without more because it lacks a reliance element. Op. 10. Many lawful proscriptions of speech do not require a showing of reliance, *see, e.g.*, 18 U.S.C. §§ 912, 1001, 1621, and do not offend the First Amendment; rather than merely punishing falsity, they seek to "protect the integrity of Government processes." *See Alvarez*, 567 U.S. at 721 (describing the function of statutes prohibiting, *e.g.*, perjury, impersonating government officials or agencies, false statements to government officials).

Here, the Deceptive Practices Provision falls even more squarely within *Alvarez*'s categories of unprotected speech than did the law at issue in *ALDF*. The Deceptive Practices provision helps to "protect the integrity of Government processes" which is something "quite apart from merely restricting false speech." *Alvarez*, 567 U.S. at 721. The sanctity of elections—the government process by which the people *choose their government*—is fundamental to American democracy. Nearly 150 years ago, the Supreme Court asked, "[c]an it be doubted that [the government] can, by law, protect the act of voting, the place where it is done, and

the man who votes from personal violence or intimidation, and the election itself from corruption or fraud?" *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884). The Court's answer was no, and has remained no. In 2018, the Supreme Court declared it did not "doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 18 n.4 (2018). Accordingly, the only speech prohibited by Minnesota's Deceptive Practices Provision is "intentionally false speech undertaken to accomplish a legally cognizable harm" and therefore it "may be proscribed without violating the First Amendment." *ALDF*, 8 F.4th at 786.

## II. Minnesota's Deceptive Practices Provision survives even strict scrutiny analysis because it is narrowly tailored.

Even if this Court finds that strict scrutiny analysis is appropriate, Minnesota's law is constitutional because it is narrowly tailored to serve Minnesota's compelling state interest "in preserving the integrity of its election process," *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), and preventing voter intimidation, *Burson v. Freeman*, 504 U.S. 191, 199, 206 (1992) (plurality opinion).

Minnesota's provision is narrowly tailored to achieve those interests. It reaches only statements the speaker "knows to be materially false," made with intent to "impede or prevent another person from exercising the right to vote," within sixty days of an election. Minn. Stat. § 211B.075, subdiv. 2(a). Indeed, the panel did not dispute that the statute targets "a narrow sliver of speech." Op. 12. It held the statute

overinclusive, reasoning that a less restrictive alternative was available because Minnesota could have countered falsehoods with an education campaign. Op. 14-15 (quoting *Alvarez*, 567 U.S. at 727, for the proposition that "[t]he remedy for speech that is false is speech that is true"). But *Alvarez*'s counter speech principle carries its own limit. Counter speech is only the remedy "[i]f there [is] time to expose through discussion the falsehood and fallacies." *Alvarez*, 567 U.S. at 727-28 (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). A voter falsely told on election morning that she is ineligible to vote or that her polling place has moved has no time to hear the counter speech, and if someone is disenfranchised because of this speech, "there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016).

Nor is the Provision insufficiently tailored because it does not reach falsehoods that encourage ineligible persons to vote. Op. 15-16. For one, the harm the panel said Minnesota ignored is addressed elsewhere. Intentionally inducing an ineligible person to register is already unlawful, *see* Minn. Stat. § 201.054, subdiv. 2, as is knowingly voting while ineligible, *id.* § 201.014, subdiv. 3. A statutory scheme should not be considered too loosely tailored because it leaves another issue to existing statutes. But even more importantly, election integrity is not the only compelling interest the Deceptive Practices Provision serves. It also helps to prevent intimidation when false information—such as the false suggestion one is committing

a felony—disenfranchises, and a state "may focus on [its] most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). This case illustrates why the second interest is at play, as false information about eligibility deters eligible voters from the polls, a form of de facto disenfranchisement documented among people with past convictions.[3]

Lastly, the panel faulted the Provision for letting "any person injured" sue, analogizing to *281 Care Committee v. Arneson*, 766 F.3d 774, 790 (8th Cir. 2014). Op. 15. But *281 Care Committee* involved an administrative complaint that "*anyone* may lodge." 766 F.3d at 790. The Deceptive Practices Provision on the other hand is narrower; a private plaintiff must have been injured by the violation. Minn. Stat. § 211B.075, subdiv. 5(b). And the private right of action serves a critical purpose. Deceptive practices are most dangerous when directed at voters that the party in power does not want to vote. A remedy left to the discretion of whoever holds office offers little protection to those voters. Thus, here, the private right of action is not a tailoring defect—it is what makes the right to vote a right, rather than a privilege extended at the pleasure of those already in power.

[3] *See, e.g.*, Erika Wood & Rachel Bloom, ACLU and Brennan Ctr. for Just., De Facto Disenfranchisement (Oct. 1, 2008), https://www.aclu.org/documents/de-facto-disenfranchisement.

## CONCLUSION

The Court should grant Defendants-Appellees' petition for en banc or panel rehearing.

Dated: September 24, 2026

Respectfully submitted,


*/s/ Anna Baldwin*
Anna Baldwin
Rachel Appel
David Kronig
Ellen Boettcher
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW, Ste. 300
Washington, DC 20036
(202) 736-2200
abaldwin@campaignlegalcenter.org
rappel@campaignlegalcenter.org
dkronig@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org

Cameron Kistler
PROTECT DEMOCRACY UNITED
2020 Pennsylvania Ave NW, Suite 163
Washington, DC 20006
(202) 579-4582
cameron.kistler@protectdemocracy.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 2,563 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word (for Microsoft 365 MSO Version 2606) in Times New Roman 14-point font.

A virus detection program was run on the brief and no virus was detected.

Dated: September 24, 2026

/s/ *Anna Baldwin*
Anna Baldwin



Appellate Case: 24-3094 Page: 18 Date Filed: 09/25/2026 Entry ID: 5687885

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2026, I electronically filed a copy of the foregoing Brief *Amici Curiae* using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 24, 2026

/s/ *Anna Baldwin*
Anna Baldwin



Appellate Case: 24-3094 Page: 19 Date Filed: 09/25/2026 Entry ID: 5687885